Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued September 19, 2003      Decided January 13, 2004

No. 02–5312

JOAN S. BUTLER,
APPELLANT

v.

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,
APPELLEE

————

Appeal from the United States District Court
for the District of Columbia
(No. 99cv00488)

————

*Stephen F. Shea* argued the cause for the appellant.

*Fred E. Haynes*, Assistant United States Attorney, argued the cause for the appellee. *Roscoe C. Howard, Jr.*, United States Attorney, and *R. Craig Lawrence*, Assistant United States Attorney, were on brief. *Mark E. Nagle*, Assistant United States Attorney, entered an appearance.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: HENDERSON, TATEL and GARLAND, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: Joan Butler appeals from the district court's judgment affirming the denial by the Social Security Administration (SSA) Commissioner (Commissioner) of her application for disability insurance benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401 *et seq.*, and supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* On appeal Butler maintains that the decision of the Administrative Law Judge (ALJ) who evaluated her case is not supported by substantial evidence in the record and was reached by the incorrect application of relevant legal standards. We agree; therefore, we reverse the judgment of the district court and remand to that court with instructions to remand in turn to the Commissioner for further proceedings.

## I. FACTUAL BACKGROUND

Joan Butler is today a 50–year-old woman with a tenth-grade education and no additional training, vocational or otherwise. From 1990 through part of 1995, Butler worked as an Environmental Services Technician (EST) at Greater Southeast Community Hospital (GSCH) in Washington, D.C.; in this capacity she performed such tasks as making beds, mopping floors and cleaning. In early August 1995 Butler suffered a severe migraine headache and was admitted to GSCH. She stayed for four days, during which time she was treated by a neurologist, Dr. William Lightfoote. His notes indicate that Butler experienced three similar "episodes" during the past five years. Joint Appendix (JA) 163. He placed her on medication (Inderal) and scheduled diagnostic tests. The results of the tests were normal and Lightfoote scheduled additional tests, including magnetic resonance imaging (MRI). On August 22, 1995 Butler attempted to return to work but suffered another migraine; the following day she saw Lightfoote who counseled her to remain off-duty for the next five days.

On August 29, 1995 Lightfoote reported that while Butler's headaches had subsided, she was experiencing "low back pain, with radiation into the lateral aspect of both legs." *Id.* 209. Lightfoote noted that the pain prevented Butler from getting out of bed. He ordered an MRI of the lumbar spine, an electromyogram (EMG) and nerve conduction tests of both lower extremities. The MRI found "narrowing and degeneration at L5–S1 . . . with a very small, subligamentous herniation of nuclear material to the right of midline that minimally flattens the thecal sac. Narrowing and degeneration at L4–5 . . . with a diffusely bulging annulus . . . [and] mild dextroscoliosis." *Id.* 156. Butler suffered another migraine on September 6, 1995 and the next day Lightfoote noted that she should remain off-duty until additional medical opinions could be obtained. Lightfoote also indicated that he would obtain a second neurological opinion from Dr. Taghi Asadi.

On Lightfoote's referral, Butler saw Dr. Alfred Pavot, who performed an electroneurodiagnostic study. On September 11, 1995 Pavot reported that the results of the study were consistent with lumbrosacral facet syndrome. Butler saw Asadi later that week. Asadi's report noted that Butler had "a history of low back pain" but was referred to him regarding the "diagnosis and management of her headaches." *Id.* 207. He described her headaches as having "a character of becoming cluster-like with more frequent attacks for a couple of weeks" and noted that his physical examination revealed "no limitation of the cervical spine." *Id.* Asadi concluded that she suffered migraines with "aura" and started her on Elavil, as she was already "receiving the maximum dose of Inderal." *Id.*

On October 17, 1995 Lightfoote observed that Butler continued to suffer lower back pain and diagnosed a herniated inverterbral disc and lubrosacral facet syndrome. He noted that when she returned to work she would "not be able to do any lifting, bending, or stooping," "no lifting greater than 10 pounds" and that this limitation would "have to be written in

her 'return-to-work contract.' "[1]  *Id.* 188.  Later that month Lightfoote completed a disability form for Butler, in which he stated that he could not determine when she would be able to return to work and described her condition as "severe limitation of functional capacity;  incapable of minimal (sedentary) activity."  *Id.* 101.

On November 16, 1995 Lightfoote reported that while Butler's headaches were "subsiding," she continued to experience "significant" pain in her lower back.  *Id.* 187.  He noted that Butler "can hardly get out of bed, without rolling over first and rolling herself out of the bed to the floor," "has difficulty standing up" and suffers "severe pain radiating into the lower extremities."  *Id.*  He stated that he doubted she would be able to return to her position at GSCH.  On December 9, 1995 Lightfoote described Butler's condition as "migraine with visual fortification spectra, lumbar disc herniation and lumbar facet syndrome."  *Id.* 176.  Based on this diagnosis, he concluded that Butler was capable of performing sedentary, clerical or administrative work with certain restrictions.  Specifically, he noted that Butler could not sit or stand for more than one hour at a time or lift objects heavier than 10 pounds and that she should never climb, bend or stoop.  On a disability form completed around the same time, Lightfoote noted these restrictions on Butler's future work activities but characterized her prognosis as "good."  *Id.* 153.  He further identified Butler as a candidate for rehabilitation services, job modification and vocational counseling.

On January 23, 1996 Lightfoote opined that Butler's headaches had become infrequent and concluded that she "is now ready" to return to work in a capacity consistent with the restrictions identified in his earlier reports.  *Id.* 204.  On April 16, 1996 Lightfoote again observed that Butler's head-

---

[1] Although it appeared at this point that Lightfoote believed Butler capable of lifting at most 10 pounds, his later reports plainly found Butler incapable of *lifting* as part of any work activity.  *E.g.*, JA 125 (July 16, 1996 report), 126–28 (July 9, 1996 report and disability form).

aches were "very infrequent" but noted that her lumbar spine problems persisted. *Id.* 203. He stated that she had a herniated disk at two levels "at least" and some days could not get out of bed. *Id.* He also referred her to Dr. Lavern Bentt for lumbar epidural steroid injections.

In a report dated May 6, 1996 Bentt stated that during the previous six months Butler's back pain had progressively worsened "to the point where she cannot sit up and stand out of bed and needs to roll herself out of bed in order to avoid excruciating pain." *Id.* 148. Bentt also remarked that aside from the moderate relief provided by physical therapy "there has been nothing that [Butler] has tried so far which has improved her pain." *Id.* Bentt noted the results of a CT myelogram, "which demonstrated mild anterior extradural defects of the thecal sac at L4–5 and L5–S1." *Id.* He performed a therapeutic lumbar epidural injection and proposed a series of additional injections in the event the first provided Butler "some degree of relief." *Id.* Butler subsequently received two additional lumbar epidural injections. At the time Butler received her third epidural injection, Bentt noted that the previous two had succeeded in easing her pain; each injection provided two weeks of complete relief but the pain eventually returned, "although not to the same intensity and degree." *Id.* 132. His report also noted that her MRI and CT myelogram showed "nerve root pathology at both L4–5 and L5–S1." *Id.* Bentt planned for Butler to return in two to three weeks for diagnostic lumbar L4–5 and L5–S1 facet joint injections. The record is silent on whether Butler received the additional injections.

According to Lightfoote's July 9, 1996 report, he completed disability forms for Butler in which he recommended that her job be modified to accommodate her back pain and headache disorder and that she receive vocational counseling and/or retraining. On the disability form, Lightfoote classified Butler's physical impairments as "severe," signifying that she is "incapable of minimal activity or sedentary work." *Id.* 128. Although he indicated that a job modification would enable

Butler to work with her impairments, he explained that Butler could not lift, bend, stoop, push or pull and characterized her prognosis for recovery as good to poor. *Id.* In his July 16, 1996 report Lightfoote stated that Butler should consider retirement on total disability or "cross-training with Vocational Rehabilitation, so that she can get a job that does not entail any lifting, bending, stooping or reaching." *Id.* 125. In a November 3, 1996 report Lightfoote stated that Butler was "continuing in a stable situation" but needed a transcutaneous electrical nerve stimulator (TENS) unit—a small device used to produce electroanalgesia—from GSCH.[2]

On November 19, 1996 Dr. James Yan, a neurologist, evaluated Butler at the request of the Disability Determinations Division of the District of Columbia Rehabilitation Services Administration (Disability Determinations Division). Yan noted that for the past three years, Butler's "main problem" had been "severe disk disease over the lumbosacral area" but that she also was hospitalized as a result of her last migraine headache, during which she experienced "a stroke-like syndrome." *Id.* 106. After finding that Butler "has severe pain which causes inability to get up easily," "cannot stand up for too long," "cannot lift heavy objects," and suffers "complex migraine headaches, which come on almost once every two months . . . [and] compromise her performance at work," Yan concluded that her examination was "otherwise . . . basically within normal limits." *Id.* 107. He also opined that Butler's spinal disks appeared to be within "normal limits." *Id.* On November 18, 1996 the Disability Determinations Division referred Butler to Dr. Harry Press for a radiology study. Two days later, Press performed a lumbar spine examination which revealed a "mild" scoliosis and atherosclerosis but was "otherwise negative." *Id.* 104.

From December 1996 to March 1997, Lightfoote issued his last set of reports contained in the record. On December 17,

---

[2] Shortly thereafter, on November 5, 1996, Lightfoote reported that Butler suffered an episode of migraine headaches.

1996 Lightfoote stated that Butler received a TENS unit for her lower back pain and that he added lithium carbonate to her prescribed medications to combat her "lingering" headache disorder. *Id.* 198. On March 17, 1997 Lightfoote opined that Butler continued to experience lower back pain and "pounding in the head" and again adjusted her prescription regimen. *Id.* 196. On the same day he stated that Butler had evidence of herniated nucleus pulposus (HNP) in her lumbar region, that an independent medical examination (IME) disclosed a possible herniated disc in the cervical region and that she had severe migraine headaches. He concluded that "at the present time[ ] [Butler] is 100% disabled from any gainful employment." *Id.* 197.

The last report contained in the record is a residual functional capacity assessment completed on March 30, 1997 by Dr. Hall, a medical consultant to the Disability Determinations Division. Hall's evaluation of Butler's exertional limitations found that she could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and/or walk at least two hours in an eight-hour workday, sit for about six hours in an eight-hour workday and had an unlimited ability to push and/or pull. With respect to her postural limitations, Hall concluded that Butler was capable of occasionally climbing, balancing, stooping, kneeling and crouching, but could never crawl or climb a ladder, rope or scaffold. Hall also concluded that Butler must avoid concentrated exposure to vibration. Hall acknowledged that his findings regarding Butler's limitations differed significantly from those of her treating physician, Dr. Lightfoote.

## II. STATUTORY FRAMEWORK

To qualify for disability insurance benefits and supplemental security income under Titles II and XVI of the Act, Butler must establish that she is "disabled." 42 U.S.C. §§ 423(a)(1)(D), 1382(a)(1). "Disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* §§ 423(d)(1)(A), 1382c(a)(3)(A). With certain exceptions not relevant here, an individual is disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(1)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for assessing a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1520, 416.920. The claimant carries the burden of proof on the first four steps. *Id.* §§ 416.1520, 416.920. First, the claimant must demonstrate that she is not presently engaged in "substantial gainful" work. *Id.* §§ 404.1520(b), 416.920(b). Second, a claimant must show that she has a "severe impairment" that "significantly limits [her] physical or mental ability to do basic work activities." *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from an impairment that meets the duration requirement and meets or equals an impairment listed in Appendix 1 to the Commissioner's regulations, she is deemed disabled and the inquiry is at an end. *Id.* §§ 404.1520(d), 416.920(d). If the claimant does not satisfy step three, the inquiry proceeds to the fourth step, which requires her to show that she suffers an impairment that renders her incapable of performing "past relevant work." *Id.* §§ 404.1520(e), 416.920(e). Once a claimant has carried the burden on the first four steps, the burden shifts to the Commissioner on step five to demonstrate that the claimant is able to perform "other work" based on a consideration of her "residual functional capacity" (RFC), age, education and past work experience. *Id.* §§ 404.1520(f), 416.920(f). It is the ALJ's application of this analytical sequence that prompted Butler's appeal.

## III. PRIOR PROCEEDINGS

Butler applied for disability insurance benefits and supplemental security income on October 10, 1996 and September

12, 1996, respectively, claiming that she had become disabled and unable to work on August 7, 1995 as the result of back pain and migraine headaches. Her applications were rejected at every stage of the administrative process. The SSA denied Butler's claims initially and upon reconsideration. At Butler's request, an ALJ subsequently held a hearing, after which he also denied Butler's claims in a decision dated January 29, 1998. In performing the five-step evaluation process outlined above, the ALJ found in Butler's favor on the first two steps: he concluded that she had not engaged in substantial gainful employment since August 1995 and that her headaches and back problems constituted severe impairments. At step three, the ALJ concluded that Butler's impairments did not meet or equal an impairment listed in Appendix 1.

Turning to step four, the ALJ determined that while Butler was incapable of performing her past relevant work as an EST, she retained the RFC "to perform sedentary work so long as she can sit or stand at her own option, where the work does not involve lifting more than four pounds or involve more than minimal stress." JA 32. As support for his conclusion, the ALJ referenced the reports of Drs. Asadi, Press, Yan and Lightfoote. The ALJ's explanation of how the medical reports supported his finding was limited to the observations that Yan's report "noted that [Butler] could not perform stressful work or lift heavy objects but otherwise her examination was basically within normal limits" and that Lightfoote's December 9, 1995 report found Butler "capable of sedentary, clerical or administrative work but she could not sit or stand for more than one hour or ever climb, bend, or stoop." *Id.*

In evaluating Butler's allegations of pain, the ALJ concluded that her pain did not preclude her from engaging in the limited range of sedentary work of which he found her capable. He explained that "there is no evidence of any underlying conditions which could be producing pain of the intensity which she has alleged." *Id.* 33. The ALJ noted that Butler had not undergone or contemplated surgery to

alleviate her pain, nor had she been hospitalized, and that her medication had brought her a measure of relief. He also found that the simple functions of daily living that she continued to perform—washing dishes, making her bed, laundering her clothes, using a car to shop for groceries once a week—were consistent with the residual functional capacity he assigned her. The ALJ therefore concluded that, insofar as Butler's daily activities were consistent with his RFC assessment, her allegations of pain were "only credible to that extent." *Id.*

Because the ALJ determined that Bulter's RFC nevertheless prevented her from performing her past relevant work, he proceeded to the final step, which obligated the Commissioner to demonstrate the existence of a significant number of jobs in the economy that someone with Butler's RFC could perform. The ALJ explained that at the hearing Leonard Perlman, an independent vocational expert, testified that someone with Butler's RFC would be able to perform approximately 20 per cent of the 200 sedentary, "unskilled occupations administratively noticed by the Commissioner" in the Medical–Vocational guidelines. *Id.* Perlman offered the occupations of film development assistant, visual inspector of small items and bindery worker as examples. Because someone with Butler's "credible limitations" was able to perform a significant number of jobs in the economy, the ALJ concluded that Butler was not disabled under the Act. *Id.*

The SSA Appeals Council affirmed the ALJ's decision on January 6, 1999. Butler then petitioned for review of the Commissioner's decision in district court under 42 U.S.C. § 405(g); she fared no better there. On August 2, 2002 the district court granted the Commissioner's motion for affirmance, concluding that, while the ALJ's finding of non-disability was "certainly spare," it rested on substantial evidence contained in the record. JA 14–19. The district court stated that the ALJ rejected Lightfoote's opinion that Butler can never stoop because "this finding contradicted the assessment of other physicians that he found credible." *Id.* 14. The district court further explained that "the ALJ considered

all of Dr. Lightfoote's reports—some of which agreed that [Butler] can perform sedentary work—alongside the other medical evidence and concluded that [Butler] can stoop occasionally." *Id.* 15. Moreover, according to the district court, the ALJ's opinion "reveals his consideration of each evidentiary source, and the reviewing court can discern his logic without difficulty and without *post hoc* explanation." *Id.* 19. The district court therefore concluded that remanding Butler's case to the agency "would be both inefficient and unreasonable." *Id.* 16. Now, more than five years after the ALJ found that Butler was not disabled, her case has made its way to us.

## IV. Discussion

"In a disability proceeding, the ALJ 'has the power and the duty to investigate fully all matters in issue, and to develop the comprehensive record required for a fair determination of disability.'" *Simms v. Sullivan*, 877 F.2d 1047, 1050 (D.C. Cir. 1989) (quoting *Diablo v. Sec'y of HEW*, 627 F.2d 278, 281 (D.C. Cir. 1980)). The Commissioner's ultimate determination will not be disturbed if it is based on substantial evidence in the record and correctly applies the relevant legal standards. 42 U.S.C. §§ 405(g), 1383(c)(3); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *Brown v. Bowen*, 794 F.2d 703, 705 (D.C. Cir. 1986). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The test "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir.) (internal quotation omitted), *cert. denied*, 124 S. Ct. 386 (2003). Although we must carefully scrutinize the entire record, *Brown*, 794 F.2d at 705, we are not to determine ourselves whether Butler is disabled; we assess only whether the ALJ's finding that she is not is based on substantial evidence and a correct application of the law. We conclude that the ALJ's decision fails this review.

Butler raises four challenges to the ALJ's decision. She claims that the ALJ failed to properly (1) account for her physical limitations in his RFC assessment; (2) weigh the opinions of her treating physician, Dr. Lightfoote; and (3) assess her allegations of pain. Because of these errors, Butler claims, the ALJ's reliance on the vocational expert's testimony to support his no disability decision was misplaced. The Commissioner counters that the ALJ reached his determination based upon a proper consideration of all the record evidence. The district court agreed with the Commissioner, finding that "the ALJ's opinion makes it clear that there is substantial evidence in the record and that his opinion rests upon that evidence." JA 18. But the substantial evidence standard requires the court to review the record itself to determine whether it substantiates the story the agency would have it tell. Granted, this level of review is a deferential one but it is no less thoroughgoing for being so. *See Brown*, 794 F.2d at 705. On a correct application of the standard, the ALJ's decision cannot stand. Accordingly, we reverse and remand to the district court with instructions to remand to the Commissioner for further proceedings. *See id.* at 709.

## A. BUTLER'S RESIDUAL FUNCTIONAL CAPACITY

Butler asserts that in assessing her RFC the ALJ failed to properly consider her inability to meet certain physical demands of work activity—namely, her inability to lift, which is an exertional limitation, as well as her inability to reach and stoop, which are both postural limitations. We agree. The ALJ's RFC assessment bears on Butler's ability to perform past relevant work (step four) and her ability to do "other work" (step five). 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f); *id.* §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii). It is designed to determine the claimant's uppermost ability to perform regular and continuous work-related physical and mental activities in a work environment. *Id.* §§ 404.1545(a)(1), 416.945(a)(1); *see also* Social Security Ruling (SSR) 96–8p, *Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *2–*3 (SSA July 2, 1996). In effect, it is

a "function-by-function" inquiry based on all of the relevant evidence of a claimant's ability to do work and must contain a "narrative discussion" identifying the evidence that supports each conclusion. SSR 96–8p, 1996 WL 374184, at *3, *7; *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In performing the RFC assessment, the ALJ must explain how he considered and resolved any "material inconsistencies or ambiguities" evident in the record, as well as the reasons for rejecting medical opinions in conflict with the ultimate RFC determination. SSR 96–8p, 1996 WL 374184, at *7.

Here the ALJ found that Butler's physical impairments prevented her from performing her past relevant work but did not preclude her from engaging in a limited range of sedentary work. He concluded that Butler "retains the residual functional capacity to perform sedentary work so long as she can sit or stand at her own option, where the work does not involve lifting more than four pounds or involve more than minimal stress."[3] JA 32. In so concluding, the ALJ was required to consider the nature and extent of any limit on her ability to "perform certain physical demands of work activity," such as lifting, reaching or stooping, that affect her ability to perform past relevant or other work. *Id.* §§ 404.1545(b), 416.945(b). Social Security Ruling 96–9p gives the ALJ additional guidance regarding the erosive effect any physical limitations may have on the "unskilled sedentary occupational base"—the occupational base to which the ALJ concluded Butler's impairments limited her. *See* SSR 96–9p, *Determining Capability to Do Other Work— Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work*, 1996 WL 374185, at *5 (SSA July 2, 1996). The Ruling explains that "[a]n accu-

---

[3] Sedentary work requires "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.* §§ 404.1567(a), 416.967(a).

rate accounting of [a claimant's] abilities, limitations, and restrictions is necessary to determine the extent of erosion of the occupational base, the types of sedentary occupations an individual might still be able to do, and whether it will be necessary to make use of a vocational resource." *Id.* at *6. With respect to an exertional limitation on lifting, the Ruling notes that "[t]he extent of erosion will depend on the extent of the limitations" and that "an inability to lift ... more than 1 or 2 pounds would erode the unskilled sedentary occupational base significantly." *Id.* The Ruling also addresses postural limitations, explaining that "[a] complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work." *Id.* at *8. Additionally, a Social Security Program Policy Statement observes that a "[s]ignificant limitation[ ] of reaching," which is "required in almost all jobs," "may eliminate a large number of occupations a person could otherwise do" and a vocational specialist may be needed to determine the effects of the limitation. SSR 85–15, *Capability to Do Other Work—The Medical–Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments*, 1985 WL 56857, at *7 (SSA 1985).

In light of this ruling and statement, it is clear that to arrive at his RFC assessment for Butler, the ALJ failed to properly consider the opinion of her treating physician, Dr. Lightfoote, who repeatedly opined that she could not lift, reach or stoop.[4]  The district court found, and the Commis-

---

[4] As detailed earlier, Lightfoote's myriad reports are replete with references to Butler's serious physical limitations.  On October 17, 1995, Lightfoote stated that "when" Butler returns to duty, she "will not be able to do any lifting, bending or stooping."  JA 103. On December 9, 1995 Lightfoote noted that Butler "should never climb, bend or stoop."  *Id.* 176.  On January 23, 1996 Lightfoote stated that Butler was able to return to work subject to the limitations he noted in December 1995.  On July 9, 1996 Lightfoote recommended that Butler "have some job modifications to enable

sioner agrees, that the ALJ rejected Lightfoote's conclusion that Butler was unable to stoop by referring to the (apparently) contrary opinions of other medical experts. JA 31–32; *see, e.g.*, *id.* 104, 106–07, 207. But the other medical opinions on which the ALJ purportedly relied do not address Butler's ability to stoop. (The ALJ cited the views of doctors Asadi, Press and Yan; Hall's opinion, which did address Butler's ability to stoop, was not cited by the ALJ.) In his November 19, 1996 report Yan noted that Butler's examination was "otherwise" within "normal limits," after having stated that Butler complained that she had disk disease over her lumbosacral area, had severe pain which prevented her from getting up easily, could not stand for too long and could not lift heavy objects. *Id.* 106–07. Yan, however, did opine that Butler's disks appeared to be "within normal limits." *Id.* Asadi's report acknowledged that Butler had a history of lower back pain, but that "there is no limitation of movement of [her] cervical spine." *Id.* 185. Butler was referred to Asadi, however, only for a second opinion on the diagnosis and treatment of her *headaches*. The ALJ also noted Press's lumbar spine examination that revealed mild scoliosis but was otherwise "negative." *Id.* 104. It is not apparent to us how these three one-time, generalized medical reports conflict with Lightfoote's continuous, specific opinion that Butler *cannot* stoop on the job. The ALJ's conclusionary attempt to justify his RFC finding that Butler was capable of engaging in a limited range of sedentary work inexplicitly cited Lightfoote's opinion that Butler could *not* perform work that required her to stoop. *Id.* 32, 176.

The same goes for Lightfoote's conclusions regarding Butler's inability to lift and reach. In concluding that Butler was capable of performing work that requires lifting of no more

---

her to work with her impairment of low back pain." *Id.* 126. On July 16, 1996 Lightfoote stated that Butler "should consider cross-training with Vocational Rehabilitation, so that she can get a job that does not entail any lifting, bending, stooping or reaching." *Id.* 125. And on March 11, 1997 Lightfoote concluded that Butler was "100% disabled from any gainful employment" because of her back pain and migraine headaches. *Id.* 180.

than four pounds, the ALJ apparently relied on Butler's testimony that she can lift a half-gallon of milk (which, according to the ALJ, weighs approximately four pounds) "with reasonable comfort." *Id.* 60. In so finding, however, he failed to explain away, or even acknowledge, Lightfoote's three specific opinions that Butler could not perform work that required *any* lifting. *Id.* 125, 128, 188. The ALJ may have discounted these opinions in view of Lightfoote's earlier notations indicating that Butler was capable of lifting up to 10 pounds. The ALJ, however, did not cite these opinions at all; rather, he relied exclusively on Butler's own testimony at the hearing. *Id.* 32. But the ALJ does not tell us how Butler's occasional lifting a half-gallon of milk conflicts with Lightfoote's opinion that Butler could not lift as part of her regular and continuous work-activity. As to Butler's second alleged postural limitation, it appears that the ALJ ignored Lightfoote's opinion that Butler could not perform work that requires any reaching. *Id.* 125. Nowhere in the ALJ's opinion is reaching mentioned, and none of the other medical opinions he references touches on it in the least.

In sum, we cannot discern from the record the ALJ's basis for rejecting Lightfoote's opinions regarding these limitations nor from his mere references to the other physicians' reports. The ALJ's reasoning is not simply "spare"—as the district court described it—in crucial particulars it is missing. Nor did he "note[ ] the contradictory evidence in the record, which record supplie[d] the reason" for his decision. *Williams v. Shalala*, 997 F.2d 1494, 1499 (D.C. Cir. 1993). This simply will not do. "The judiciary can scarcely perform its assigned review function, limited though it is, without some indication not only of what evidence was credited, but also whether other evidence was rejected rather than simply ignored." *Brown*, 794 F.2d at 708.

The Commissioner contends that the ALJ must have interpreted Lightfoote's opinion that Butler should never stoop to mean that she should stoop "very little" or "only occasionally." Appellee's Br. at 22. While this interpretation may have some intuitive appeal, the ALJ did not articulate this view in

his decision[5] and Lightfoote's multiple opinions are not easily susceptible of such an interpretation. Despite his hopeful statements regarding Butler's capacity to perform some gainful activity, Lightfoote consistently opined that any job Butler performed had to accommodate her inability to stoop. JA 103, 125, 126, 176, 180, 204. The Commissioner also directs our attention to Hall's RFC assessment, which found Butler capable of lifting 10 pounds frequently and stooping occasionally. Although Hall's assessment conflicts with Lightfoote's opinions, the ALJ apparently did not rely on Hall's assessment as that assessment was not cited in the ALJ's order. *Id.* 31–32. And in view of Lightfoote's consistent opinions to the contrary, Hall's report, without more, does not constitute substantial evidence that Butler is capable of frequently lifting 10 pounds and stooping occasionally.[6] We are therefore at a loss to locate in the lengthy record substantial evidence supporting the ALJ's determination that Butler is capable of lifting four pounds, reaching and occasionally stooping on the job.

## B. Lightfoote's Medical Opinions

Butler argues that the ALJ failed to properly evaluate Lightfoote's medical opinions. Lightfoote's opinions, as those of Butler's treating physician, are entitled to "controlling weight" if they are not inconsistent with other substantial record evidence and are well-supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Indeed "when all of the

---

[5] *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] simple but fundamental rule of administrative law . . . is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").

[6] We note that Hall prepared his RFC assessment by checking boxes on a pre-printed administrative form and offered little or no explanation for his choices.

factors are satisfied[ ][7] the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion." SSR 96–2p, *Giving Controlling Weight to Treating Source Medical Opinions*, 1996 WL 374188, at *2 (SSA July 2, 1996). As the regulations assure claimants, "[w]e will always give good reasons in our notice of . . . decision for the weight we give your treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

We have a "treating physician rule" of our own. "Because a claimant's treating physicians have great familiarity with [her] condition, their reports must be accorded substantial weight." *Williams*, 997 F.2d at 1498 (internal quotation omitted). A treating physician's report is "binding on the fact-finder unless contradicted by substantial evidence." *Id.* (internal quotation omitted). We thus require an ALJ "who rejects the opinion of a treating physician [to] explain his reasons for doing so." *Id.* Here, however, the ALJ offered little more than the bare statement that "the record is consistent with claimant retaining a residual functional capacity to perform the range of sedentary work noted . . . ." JA 32. The ALJ's passing references to the other medical opinions are insufficient to override the substantial weight due Lightfoote's opinion. Furthermore, Lightfoote's opinions were confirmed by the results of an MRI, a CT myelogram, an EMG, an IME, and an electroneurodiagnostic study. We thus cannot conclude, as did the district court, that "credible medical opinions undermine Dr. Lightfoote's opinion" or that the ALJ's "logic" can be understood "without difficulty." *Id.* 19.

Relying on our decision in *Williams*, the Commissioner argues that the ALJ's acknowledgment of contrary evidence alone supplies an adequate basis for his decision. This case is

---

[7] The ALJ is to consider the following six factors when evaluating a treating physician's medical opinion: (1) length of the treating relationship and frequency of examination; (2) nature and extent of the treating relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that tend to support or contradict the medical opinion. 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

not analogous to *Williams*, however, because the ALJ here did *not* acknowledge the contradictory evidence in the record, "which record supplie[d] the reason" for rejecting the treating physician's opinion. 997 F.2d at 1499. Our decision in *Simms*, in which we remanded to the Commissioner for the ALJ to explain the weight he attached to one of the claimant's treating physicians' opinions, supplies the more fitting analogue. 877 F.2d at 1052–53. In *Simms* the ALJ offered no reason for rejecting the claimant's treating physician's view in favor of those of consulting physicians. *Id.* at 1052. We held that upon remand, "the ALJ should explain what weight he attaches to [the treating physician's] conclusions, or if he attaches none, his reason therefor." *Id.* at 1053. We believe we should impose the same directive here.

## C. Evidence of Pain

Butler asserts that the ALJ failed to properly assess her credibility in rejecting her claim that she suffers disabling back pain.[8] We conclude that the ALJ's analysis here suffers from the same shortcoming that undermined his RFC assessment and rejection of Lightfoote's opinions; namely, he did not properly consider Butler's physical limitations. The applicable regulations prescribe a two-step process to determine whether a claimant suffers from symptoms (including pain) that affect her ability to perform basic work activities. 20 C.F.R. §§ 404.1529, 416.929. First, the claimant must adduce "medical signs or laboratory" findings evidencing a "medically determinable impairment that could reasonably be expected to produce" the alleged pain. *Id.* §§ 404.1529(a)-(b), 416.929(a)-(b); *see also* 42 U.S.C. §§ 423(a)(5)(A), 1382(H)(i). The objective evidence must confirm the existence of an impairment "reasonably expected to produce," 20 C.F.R. §§ 404.1529(b), 416.929(b), "the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 594.

---

[8] In her brief, Butler appeared to argue that the ALJ also failed to assess her credibility in rejecting her allegations of pain caused by her migraine headaches. Appellant's Br. at 27. At oral argument, however, Butler's counsel clarified that she challenges the ALJ's credibility determination only in relation to her back pain.

Once the claimant crosses this threshold, the second step assesses the persistence and intensity of the claimant's pain as well as the extent to which it impairs her ability to work. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

The latter evaluation entails not only the claimant's statements about her pain but also "all the available evidence," including the claimant's medical history, medical signs and laboratory findings; objective medical evidence of pain; the medical opinions of the claimant's treating physician; and any other evidence that bears on the severity of the pain. *Id.* §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *Craig*, 76 F.3d at 594–95. As to other evidence bearing on the severity of pain, the regulations provide that because pain is "subjective and difficult to quantify," the Commissioner takes account of "any symptom-related functional limitations and restrictions" reported by the claimant and her treating physician "which can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Factors the Commissioner considers as relevant to assessing a claimant's pain are: the claimant's daily activities; the "location, duration, frequency, and intensity of" the claimant's pain; "precipitating and aggravating factors"; "the type, dosage, effectiveness, and side effects of any medication" for pain relief; treatment the claimant receives or has received, other than medication, for pain relief; "any measures" the claimant uses to relieve pain; and "other factors concerning [the claimant's] functional limitations and restrictions due to pain." *Id.* §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).

In considering the extent to which the claimant's pain interferes with her capacity to engage in basic work activities, the regulations provide that the ALJ evaluates the claimant's "statement in relation to the objective medical evidence and other evidence," *id.* §§ 404.1529(c)(4), 416.929(c)(4), including "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your medical history, the medical signs and laboratory findings, and statements by your treating or examining physician or

psychologist or other persons about how your symptoms affect you." *Id.* And a claimant's allegations of pain will be "determined to diminish [her] capacity for basic work activities" only insofar as her "alleged functional limitations and restrictions due to . . . pain . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

Social Security Ruling 96–7p supplies further guidance to the ALJ on how to evaluate pain. Once an underlying impairment that could reasonably be expected to generate the alleged pain has been established, the intensity, persistence and limiting effects of the pain must be evaluated "to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of An Individual's Statements*, 1996 WL 374186, at \*1 (SSA July 2, 1996). This determination in turn requires "the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." *Id.* In determining the individual's credibility, the ALJ "must consider the entire case record" and may not disregard the individual's statements about the intensity and persistence of her pain "solely because they are not substantiated by objective medical evidence." *Id.* The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.* at \*2.

Applying step one (and perhaps step two) of the analysis, the ALJ concluded that "there is no evidence of any underlying conditions which could be producing pain of the intensity which [Butler] has alleged." JA 33. His conclusion that "no evidence" supports her allegations once again reflects his failure to properly evaluate Lightfoote's opinions. Moreover, Lightfoote is not alone in concluding that Butler suffers from lumbar disk herniations and lumbosacral facet syndrome— diagnoses which the ALJ appears to have credited. *Id.* 82,

104, 116, 132. Pavot's electroneurodiagnostic study diagnosed lumbar facet syndrome, while Press's lumbar spine examination revealed scoliosis and atherosclerosis. Bentt also noted that Butler's MRI and CT myelogram indicated "nerve root pathology at both L4–5 and L5–S1." *Id.* 132. And even Hall's RFC assessment lists Butler's primary diagnosis as herniated disk disease. *Id.* 82. The ALJ may have thought that these diagnosed conditions could not produce the *degree* of pain Butler claimed to suffer but such a conclusion would be near impossible to understand without some explanation, if for no other reason than that the diagnoses are consistently accompanied by descriptions of incapacitating pain. *See, e.g.*, *Id.* 132, 148–49, 203. The ALJ may have rejected these evaluations by inferring from Yan's and Press's reports that Butler's condition could not produce severe pain; however, he has not articulated this position and, given all of the evidence to the contrary, the record cannot do it for him.

## D. Vocational Expert's Testimony

Butler asserts that at step five the ALJ improperly relied on the vocational expert's testimony to establish that she is capable of performing "other work." We agree. If the ALJ looks to a vocational expert in assessing a claimant's ability to do other work, the ALJ "must accurately describe the claimant's physical impairments in any question posed to the expert." *Simms*, 877 F.2d at 1050; *see also Williams*, 997 F.2d at 1499; *Diablo*, 627 F.2d at 283. Deficiencies in the ALJ's description of the claimant's condition "undermine the foundation for the expert's ultimate conclusion that there are alternative jobs" that the claimant is capable of performing. *Simms*, 877 F.2d at 1053; *see also Williams*, 997 F.2d at 1499.

We cannot say that the hypothetical question the ALJ posed to the vocational expert accurately reflected Butler's physical limitations. The ALJ asked whether work exists in the economy for someone of "claimant's age, education, and work background" who can perform a limited range of seden-

tary work. JA 68. The ALJ qualified the hypothetical by adding that the work available must allow her to sit or stand at her own option, not require her to lift more than four pounds and involve only minimal stress. The vocational expert answered affirmatively, concluding that such a person would be able to find gainful employment in 20 per cent of the 200 sedentary, unskilled occupations significantly represented in the economy that the Commissioner has "administratively noticed," and offered as examples of such jobs, film development assistant, visual inspector and bindery worker. *Id.* 68–69.

In *Simms*, we found the hypothetical question the ALJ posed to the vocational expert fatally defective because it omitted significant aspects of the claimant's condition. 877 F.2d at 1053. We explained there that the ALJ failed to apprise the expert that the claimant complained of pain; that the claimant's medication made him drowsy; that the claimant might have had to rely on a medical device that compromised the use of his remaining arm; and that the claimant had a limited ability to hold and carry the objects he could lift. *Id.* We therefore remanded the case to the Secretary[9] "to rule anew (at step five) on [the claimant's] ability to perform 'other work.'" *Id.* We do likewise here because the ALJ's hypothetical question failed to include Butler's physical limitations regarding lifting, reaching and stooping. *Id.*

\* \* \*

For the foregoing reasons, we reverse the judgment of the district court and remand the case to that court with instructions to remand to the Commissioner for further proceedings consistent with this opinion.

*So ordered.*

---

[9] The duties of the Secretary of the Department of Health and Human Services in social security cases were transferred to the SSA Commissioner as of March 31, 1995. *See* 42 U.S.C. §§ 901, 902.