# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 24, 2017   Decided June 15, 2018

No. 16-1133

DUKE ENERGY CORPORATION, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PJM INTERCONNECTION, L.L.C.,
INTERVENOR

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*Matthew Allen Fitzgerald* argued the cause for petitioners. With him on the briefs were *Noel H. Symons* and *Katlyn A. Farrell*.

*Elizabeth E. Rylander*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Robert H. Solomon*, Solicitor, and *Susanna Y. Chu*, Attorney.

*Jeffrey W. Mayes* argued the cause for intervenor PJM Interconnection, L.L.C., and amicus curiae Independent Market Monitor for PJM. With him on the brief were *Michael*

*J. Thompson* and *Paul M. Flynn*. *Ryan J. Collins* entered an appearance.

Before: TATEL, GRIFFITH, and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: To prepare for a bitterly cold day during the January 2014 "polar vortex," Duke Energy Corporation, a generator of electricity, purchased exceptionally expensive natural gas, which it ended up not needing. Claiming that its regional transmission organization, PJM Interconnection, had directed it to purchase the gas and that the governing tariff provided for indemnification, Duke sought reimbursement for its losses. PJM rejected Duke's claim, as did the Federal Energy Regulatory Commission (FERC). For the reasons set forth in this opinion, we deny Duke's petition for review.

**I.**

The United States electrical grid has been described as "the most complex machine ever made." Phillip F. Schewe, *The Grid: A Journey Through the Heart of Our Electrified World* 1 (2007). Fortunately, only a few details are necessary to understand this case.

PJM Interconnection, L.L.C., Intervenor here, a regional transmission organization, operates the transmission system spanning all or part of thirteen mid-Atlantic and Midwestern states. PJM also manages the markets in which electricity is bought and sold within this territory.

Most electricity is traded in PJM's "day-ahead market." Generators offer electricity into that market by noon each day,

including in their offers not only the price, but also the amount of notice they will need to provide the electricity. Based on predicted demand, PJM then derives a market-clearing price for all sales to be made the next day and, by 4 P.M., notifies generators whether and when they are scheduled to run. Even if a generator is scheduled to run, however, PJM may or may not call on it to provide energy, depending on demand and other variables.

PJM also manages a yearly "capacity market." "The capacity market is designed to ensure sufficient resources are available to maintain the reliability of the system." *Duke Energy Corp. v. PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,206, 62,279 (2015) (Initial Order). Generators bid into that market to become Generation Capacity Resources—generators paid to offer all of their available capacity into the day-ahead market and to operate if called upon by PJM. As FERC explained while interpreting a similar tariff, "economic considerations are irrelevant to determining whether a unit is physically available." *New England Power Generators Association, Inc. v. ISO New England Inc.*, 144 FERC ¶ 61,157, 67,902–03 (2013) (internal quotation marks omitted).

Petitioners, Duke Energy Corporation and various other related corporate entities ("Duke"), are members of the PJM Tariff, a contract between PJM and the member utilities. Duke operates the Lee Facility, located 90 miles west of Chicago, which has eight eighty-megawatt natural-gas-fired combustion turbines. In 2014, the year at issue here, Duke's Lee Facility functioned as a Generation Capacity Resource.

In January of 2014, extreme cold temperatures and wintry conditions affected much of the Eastern United States, resulting in a dramatic increase in demand for electricity.

Coupled with a pipeline explosion in Canada, this "polar vortex" caused natural gas prices to spike. Duke normally obtained its gas through an agreement with Natural Gas Pipeline Company (NGPL), under which it could take gas as needed throughout the day. During the polar vortex, however, NGPL instituted several restrictions that made gas purchases both riskier and less convenient. No longer able to take gas as needed, Duke had to reserve it well in advance. This situation, combined with the extreme weather, created a perfect storm for generators like Duke.

The events at issue here took place on January 27, 2014, when PJM projected that energy demand for the next day would be 140,000 megawatts, well above previous record peaks. Such an extreme demand posed a serious risk of power outages during subzero temperatures. At 8:45 A.M., PJM issued an emergency announcement to generators, informing them of the projected emergency and issuing what the Tariff calls a "maximum emergency generation alert." Transcript of Automated Call from Kevin Etch, PJM, to Brian Murrell, Duke (Jan. 27, 2014, 08:45 EPT), Joint Appendix (J.A.) 140. Under the Tariff, that alert obliged all generators, including Duke, to "comply with all directions from [PJM] for the purpose of managing, alleviating, or ending an Emergency." PJM Tariff, Att. K § 1.7.11(a), J.A. 380.

Upon hearing the alert, Duke's Managing Director of Generation and Dispatch, Greg Cecil, faced a difficult choice: he could buy gas before noon, when it was cheapest, though he would risk losing money if the Lee units never needed to run; alternatively, he could postpone purchasing gas until he knew whether the Lee units were scheduled to run, though in that case he would risk paying more for gas. Seeking advice, Cecil called PJM's dispatch desk and spoke to Master Dispatcher

Nathan Marr to discuss whether Duke should pre-purchase gas. This was the first of three back-to-back conversations that lie at the heart of the dispute before us.

In the first conversation, Cecil informed Marr that "gas is very difficult" at the Lee facility, "[b]ut, I might be able to buy some day ahead and have it scheduled ratably for tomorrow." Transcript of Telephone Call from Greg Cecil, Duke, to Nathan Marr, PJM (Jan. 27, 2014, 08:53 EPT), J.A. 141 (First Conversation). Cecil emphasized, however, that if he did purchase the gas, he needed "to be able to come on"; that is, he needed PJM to call on the Lee units to provide power. *Id.* Marr replied that he "[could not] anticipate what is going to be the situation," but explained that, given the emergency situation, "more than likely, your units will be running. . . . I can't guarantee 100% that you will be on. 99.9% you will run though." *Id.*, J.A. 142.

In response, Cecil explained that because gas was very expensive, "I may be able to [pre-purchase gas] for some of the [Lee units] but probably not all of them." *Id.* Marr replied that "[w]e want all units available for tomorrow." *Id.* And though Cecil objected that "[g]as is my limiting factor," Marr spoke over him: "If you can secure gas, we would advise you to secure gas for your units. We want all units available for tomorrow." *Id.* Cecil repeated that "I don't know that I'd be able to do it for all of [the units]," but Marr cut him off with an "Alright?" to which Cecil responded, "Okay." *Id.*

A few minutes later, Marr called Cecil back, but because Cecil had stepped away, Marr relayed his message to another Duke employee:

> We want your units available. . . . If [Cecil is] not
> securing gas based on an economic decision – this is
> not an economic decision. This is a reliability issue,
> so all units must be available. . . . And if there is any
> other further issues with that, he can call me back and
> I can talk to him or he can talk to my manager.

Transcript of Telephone Call from Nathan Marr, PJM, to Brian Murrell, Duke (Jan. 27, 2014, 08:56 EPT), J.A. 143–44 (Second Conversation).

Cecil then returned Marr's call, asking him to confirm that PJM was facing a "reliability issue." Transcript of Telephone Call from Greg Cecil, Duke, to Nathan Marr, PJM (Jan. 27, 2014, 08:59 EPT), J.A. 145 (Third Conversation). Marr reiterated that "[PJM is] anticipating reliability issues, so all units need to be available, it is not an economic decision." *Id.* Thanking Marr for the information, Cecil again explained that gas was difficult to procure and "this is the information I will hopefully be able to use with [NGPL]." *Id.*, J.A. 145–46.

Following these conversations, Duke purchased enough gas—$12.5 million worth—to run five of the eight Lee units. This allowed Duke to bid those units into the day-ahead market with short notification times, meaning PJM could call on these units with little warning. The other three units were bid in with longer notification times. PJM, however, never dispatched any of the Lee units, leaving Duke, after mitigation efforts, with a $9.8 million loss.

Duke then requested compensation from PJM. Relying on Section 10.3 of the Tariff, which provides for indemnification from any damages "arising out of or resulting from . . . a Generation Owner's [] acting in good faith to implement or

comply with the directives of the Transmission Provider," Duke argued that PJM was required to reimburse Duke for its losses. Letter from Noel Symons, Attorney for Duke, to Jacqulynn B. Hugee, PJM Assistant General Counsel (Apr. 2, 2014), J.A. 186. PJM denied indemnification, maintaining that it had issued no directive and that, regardless, the indemnification clause was inapplicable to the situation.

Duke then took its case to FERC, filing a complaint against PJM pursuant to Section 306 of the Federal Power Act (FPA), 16 U.S.C § 825e ("Any . . . electric utility . . . complaining of anything done or omitted to be done by any . . . transmitting utility . . . in contravention of the provisions of this chapter may apply to the Commission by petition . . . ."), alleging that PJM had failed to fulfill its obligations under Section 10.3 of the Tariff. In the alternative, Duke sought a one-time limited waiver of certain provisions of the Tariff, which would also have allowed Duke to recover its losses.

FERC denied Duke's complaint on both grounds, with one member dissenting on the latter issue, which Duke has not appealed. The Commission rejected Duke's indemnification claim for two reasons. First, it held that Section 10.3 "should not be interpreted to guarantee reimbursement of a generator's losses on gas purchases incurred in meeting its capacity resource obligations in PJM." Initial Order at ¶ 62,279. Second, having reviewed the conversations between Cecil and Marr, it found that "Duke [did not] act[] pursuant to a directive from PJM that might entitle it to the reimbursement it seeks." *Id.* These two rulings centered on a single fact: "As a Generation Capacity Resource, Duke was already obligated to be available." *Id.* ¶ 62,280. FERC denied Duke's request for rehearing, and this petition followed.

## II.

Challenging both of FERC's rationales, Duke insists that PJM did issue a directive to buy gas and that the Tariff does provide for indemnification for losses sustained as a result of such a directive. As Duke acknowledges, it can succeed here only by prevailing on both arguments.

We begin with the first question—did PJM issue a directive to Duke to buy gas?—keeping in mind our deferential standard of review. The FPA provides that "[t]he finding of [FERC] as to the facts, if supported by substantial evidence, shall be conclusive." 16 U.S.C § 825*l*(b). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "The test 'requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence.'" *Id.* (quoting *Florida Municipal Power Agency v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003)).

Duke concedes that "it is not a 'directive' to tell someone to do something they already must do," Pet'rs' Br. 28, and that, as a Generation Capacity Resource, the Lee facility was obliged to run if called upon. Accordingly, as Duke recognizes, PJM issued no directive when it instructed Duke to make the Lee units available. Instead, Duke argues that PJM directed it to purchase gas.

Marr mentions gas only twice. During the first conversation, he "advises" Cecil to procure gas, immediately reiterating that all units must be available. First Conversation, J.A. 142. In the second conversation, Marr reminds Cecil that

the situation is "a reliability issue, not [an] economic [decision] concerning gas." Second Conversation, J.A. 143.

Duke never argues, and properly so, that Marr's two statements amounted to a direct order to Cecil to purchase gas. Instead, Duke contends that the full context of the morning makes clear that "PJM intruded on Duke's normal economic gas-buying decision and instructed it to act." Pet'rs' Br. 28. Given that PJM announced an emergency and that Marr took the trouble to call Cecil back after the first conversation, Duke argues, PJM clearly meant to issue a directive. "No one who listens to the tapes or reads the transcripts of these conversations could reasonably interpret PJM as taking the trouble to call Duke back to say" that Duke may hold off on buying gas and offer the Lee units with high prices and long notification windows. *Id.* at 34. According to Duke, it makes no difference that Cecil and Marr discussed neither notification windows nor prices because such matters "were understood." *Id.* Urging us to listen to audio recordings of the phone conversations, Duke maintains that "the tone of the conversations further emphasizes the urgency of the situation and the directive that PJM was giving to Duke." *Id.* at 34 n.4. Duke also maintains that Marr's repeated statement that the decision was not economic indicates that PJM was taking the reins because Cecil and Marr both understood that economic decisions were Duke's to make. Oral Arg. Rec. 24:20–25:30 (Duke's attorney pointing to Marr's statement that "this is not an economic decision" as the best evidence in the transcripts of PJM's directive); Pet'rs' Br. 32 ("Both PJM and Duke understood what they were discussing. PJM understood that . . . Duke's normal economic judgment would cut against purchasing gas right away. But . . . PJM did not want Duke to make decisions based on the price of gas.").

By reading between the lines, Duke assures us, we too will understand that "this is not an economic decision" was a code that both Cecil and Marr understood to mean that PJM was issuing a directive. But we are not here to find facts. Instead, we are required to defer to FERC's factual findings, which, "if supported by substantial evidence . . . [are] conclusive." 16 U.S.C § 825*l*(b). This deference recognizes that the Commission, given its expertise in these matters, is far better suited than this court to know what the parties "understood." *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989) (holding that courts must defer to the "informed discretion" of federal agencies where the agencies' decisions require "a high level of technical expertise" (internal quotation marks omitted) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976))).

After reviewing the conversations between Marr and Cecil, FERC found that PJM never directed Duke to buy gas. *Duke Energy Corp. v. PJM Interconnection, L.L.C.*, 154 FERC ¶ 61,156, at 13 (2016), J.A. 54. "Contrary to Duke's view, Mr. Marr's statements to Mr. Cecil on the morning of January 27 were not a specific order to Duke to take actions that went beyond Duke's pre-existing contractual requirements." *Id.* The Commission explained, "Marr said nothing about when to purchase natural gas, at what price to purchase the gas, how to bid into the market, or to take any action beyond that which Duke is otherwise obligated to take under the tariff: to purchase natural gas to be prepared to run its units." *Id.* at 15, J.A. 56.

Duke argues that FERC was mistaken. Asserting that it need not have purchased gas on the 27th in order to run its units on the 28th, Duke argues that Marr's statements went beyond reminding the company of its Tariff obligation (to be available when called upon) and directed it to purchase gas. But FERC,

reading Marr's two gas-related statements together with the rest of the conversations—including Marr's insistence that all units be available, which he repeated four times—concluded that both mentions of gas were entirely in service of Marr's instruction to do whatever needed to be done to fulfill its Tariff obligation to make the Lee units available. "[Marr] was responding to a request as to whether these units would choose not to run for economic reasons, and responded to that request. . . . Marr's statement that economics is not a factor merely reflects Duke's Tariff obligation to be prepared to run its units." *Id.*

Moreover, as FERC observed, given the maximum generation emergency and the problems Duke was facing as a result of the constraints imposed by NGPL, its gas supplier, it seems likely that declining to purchase gas on the 27th would have left Duke unable to run the Lee units on the 28th, "a risk [neither] sanctioned [n]or permitted under the tariff." *Id.* at 15 n.54, J.A. 56. And to the extent Duke had other options, "the conversation [between Marr and Cecil] reflected none of these considerations. As far as [Marr] knew, Duke was contemplating taking the gamble not to buy gas so the units would not be available, and [Marr] was informing Duke that PJM believed it needed those units to be prepared to run – as Duke is obligated under the tariff to do." *Id.* at 16, J.A. 57.

To be sure, the record may well be subject to other interpretations—Duke's preferred interpretation perhaps among them. But our task is not to assess whether Duke's interpretation of the record is fair. Just the opposite: we must accept FERC's interpretation unless unsupported by substantial evidence. 16 U.S.C § 825*l*(b). And Duke has given us no basis for believing that a "reasonable mind" would not find the evidence here "adequate to support [FERC's]

conclusion." *Butler*, 353 F.3d at 999 (quoting *Richardson*, 402 U.S. at 401).

### III.

Because we conclude that the Commission's finding that PJM never directed Duke to buy gas is supported by substantial record evidence, we have no need to address Duke's argument that, had such a directive been issued, the Tariff would have authorized indemnification. The petition for review is denied.

*So ordered.*