# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 1, 2023          Decided July 28, 2023

No. 22-5050

ANGELA M. COX,
APPELLANT

v.

KILOLO KIJAKAZI, ACTING COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,
APPELLEE

———

Consolidated with 22-5070

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:18-cv-02389)

———

*Christine P. Benagh* argued the cause and filed the briefs
for appellant/cross-appellee.

*Alisa B. Klein*, Attorney, U.S. Department of Justice,
argued the cause for appellee/cross-appellant. With her on the
briefs were *Brian M. Boynton*, Principal Deputy Assistant
Attorney General, and *Edward Himmelfarb*, Attorney. *Jane M.
Lyons*, Assistant U.S. Attorney, entered an appearance.

Before: SRINIVASAN, *Chief Judge*, MILLETT and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: In 2014, Angela Cox applied for Supplemental Security Income based on disability. While her application was pending, the Social Security Administration promulgated rules with new criteria for demonstrating disability and made them applicable to pending claims like Cox's. An Administrative Law Judge subsequently found Cox ineligible for benefits under those updated criteria.

Cox then filed suit in federal district court, and the court overturned the agency's decision on the ground that application of the new criteria was impermissibly retroactive. The court ordered the agency to reconsider Cox's case under the criteria in place when she first filed her claim. The district court rejected all of Cox's other challenges to the agency's decision.

Cox and the Social Security Administration have cross-appealed. We hold that application of the new criteria to Cox's pending claim was not retroactive, but that the Administrative Law Judge erred in his analysis of evidence from Cox's treating physician. Accordingly, we reverse the district court's decision and remand for further proceedings.

3

**I**

**A**

**1**

The Social Security Act, 42 U.S.C. § 301 *et seq.*, was enacted in 1935 in response to economic suffering and deprivation caused by the Great Depression. *See Smith v. Berryhill*, 139 S. Ct. 1765, 1771 (2019). Title XVI of the Act, 42 U.S.C. §§ 1381–1383f, sets out the Supplemental Security Income ("SSI") program, which provides benefits for low-income individuals who are over 65 years old, those who are blind, and those who are disabled. *See id.* §§ 1381, 1381a, 1382; *see also Bowen v. Galbreath*, 485 U.S. 74, 75 (1988).

To be eligible for SSI based on disability, a claimant must demonstrate that disability prevents her from earning a living. In particular, the Act requires that a successful claimant be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" that either "can be expected to result in death" or "has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Such an impairment must be severe enough that a claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work * * * in the national economy[.]" *Id.* § 1382c(a)(3)(B).

The Social Security Administration ("Administration") has promulgated regulations that set out a sequential, multi-step process for determining whether a claimant is disabled.

4

First, the claimant must show that she is not engaged in "substantial gainful activity[.]" 20 C.F.R. §§ 416.920(a)(4)(i), (b).

Second, the claimant must show that she has a "severe medically determinable physical or mental impairment" that meets the statutory requirements. 20 C.F.R. § 416.920(a)(4)(ii); *see id.* §§ 416.909, 416.920(c); 42 U.S.C. § 1382c(a)(3)(A).

Third, the claimant can establish a qualifying disability by showing that she "suffers from an impairment that meets or equals an impairment listed in the appendix to the [Administration] regulations[,]" which is known as its "Listings." *See Jones v. Astrue*, 647 F.3d 350, 353 (D.C. Cir. 2011). If the claimant has met the first two steps and her disability is on that list, she is deemed disabled and qualifies for benefits, with no further inquiry. 20 C.F.R. §§ 416.920(a)(4)(iii), (d); *Jones*, 647 F.3d at 353.

Fourth, if the claimant's impairment does not fall within the Listings, she may still be entitled to benefits. Under step four, the Administration evaluates the claimant's "residual functional capacity and [her] past relevant work." 20 C.F.R. § 416.920(a)(4)(iv). An individual's "residual functional capacity" is "the most [she] can still do despite [her] limitations." *Id.* § 416.945(a)(1); *see Butler v. Barnhart*, 353 F.3d 992, 1000 (D.C. Cir. 2004) (residual functional capacity inquiry "is designed to determine the claimant's uppermost ability to perform regular and continuous work-related physical and mental activities in a work environment"). So step four evaluates whether the claimant is able, physically and mentally, to perform her past relevant work. If she can, then she will be found not disabled. *See* 20 C.F.R. §§ 416.920(e), (f).

In making the residual functional capacity determination, the Administration considers medical and other evidence. By regulation, the Administration is required to give "controlling weight" to the opinions of a treating physician "if they are not inconsistent with other substantial record evidence and are well-supported by medically acceptable clinical and laboratory diagnostic techniques." *Butler*, 353 F.3d at 1003 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)) (internal quotation marks omitted); *see id.* (according "substantial weight" to the opinions of treating physicians) (quoting *Williams v. Shalala*, 997 F.2d 1494, 1498 (D.C. Cir. 1993)). If the Administration does not give a treating physician's opinion controlling weight, then the Administration must "always give good reasons * * * for the weight" it does give the opinion. *See* 20 C.F.R. § 404.1527(c)(2).

The claimant bears the burden of proof at each of those four steps. *Jones*, 647 F.3d at 352. If the claimant succeeds, then the burden shifts, at the fifth step, to the Commissioner of Social Security to demonstrate that the claimant can perform other work. *See* 20 C.F.R. § 416.920(a)(4)(v). To meet that burden, the Commissioner must show that the claimant "can make an adjustment to other work, and must show that there are jobs in the national economy that the claimant can perform" in light of the claimant's "residual functional capacity, age, education, and work experience[.]" *Jones*, 647 F.3d at 353 . If the Commissioner cannot make that showing, then the claimant is disabled and entitled to benefits. *Id.*

**2**

This case involves step three, which considers whether the claimant's impairment fits within the Administration's "Listings." At the time Angela Cox applied for SSI benefits,

the Administration's Listings provided that a claimant would be deemed disabled if she had "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05 (2014) ("2014 Listings"). The regulation then listed four possible ways that the "required level of severity" for this disorder could be met:

A. Mental incapacity evidenced by dependence upon others for personal needs (*e.g.*, toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; OR

B. A valid verbal, performance, or full scale IQ of 59 or less; OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation,
each of extended duration.

*Id.*

While Cox was waiting for a hearing before an Administrative Law Judge ("ALJ"), the Administration promulgated new Listings. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138 (Sept. 26, 2016) ("2017 Listings"). The updated Listings became effective January 17, 2017, and applied both to "new applications filed on or after the effective date of the rules, and to claims that [were] pending on or after the effective date." *Id.* at 66,138.

The 2017 Listings provide that a claimant is disabled if she has an intellectual disorder and her "[1] disorder is characterized by significantly subaverage general intellectual functioning, [2] significant deficits in current adaptive functioning, and [3] manifestation of the disorder before age 22." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00B(4)(a); *see* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. at 66,161.[1]

The first element "requires a claimant to have obtained either" a full-scale IQ score of 70 or below, or a full-scale IQ score of 71–75 with a verbal or performance IQ score of 70 or below. Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. at 66,155. The second element requires an "extreme limitation of one, or marked limitation of

---

[1] A claimant may also be deemed intellectually disabled under the 2017 Listings if she lacks the cognitive ability to participate in an IQ test. Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. at 61,155.

two" of: (a) abilities to understand, remember, or apply information; (b) interaction with others; (c) concentration, persistence, or maintaining pace; or (d) adapting or managing one's self. *Id.* at 66,167. Finally, the claimant must provide evidence that "demonstrates or supports the conclusion that the disorder began prior to age 22." *Id.*

**B**

**1**

Angela Cox is 57 years old. Her complaint alleges that she has an IQ of 61, and that she is illiterate and experiences a variety of health problems.

Cox has pursued SSI benefits from the Administration for nearly a decade. She first applied for benefits in May 2014. Five months later, her application was rejected. Cox applied again in November 2014. Her claim was denied in June 2015, and again on reconsideration. Cox then filed a request for a hearing in front of an ALJ. A hearing was held in January 2018.

In April 2018, the ALJ denied Cox's request for benefits. The ALJ found that Cox had met her burden at steps one and two because (1) Cox had not engaged in substantial gainful activity since her November 2014 application for benefits, and (2) her four severe impairments (a learning disorder, an intellectual disorder, a depressive disorder, and an anxiety disorder) significantly limited her ability to perform basic work activities.

At step three, the ALJ found that Cox's impairments did not map onto the 2017 Listings. The ALJ found that Cox did not meet the latter two of the three elements—"significant

deficits in current adaptive functioning, and manifestation of the disorder before age 22[,]" 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00B(4)(a); *see* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. at 66,161. The ALJ explained that Cox "does not have an extreme or marked limitation in any area of mental functioning[,]" and so "does not have the requisite marked lack of cognitive functioning currently to meet the listing." J.A. 120. The ALJ also noted that her mental capacity was tested at age 48, which the ALJ found was 26 years beyond the required showing of an impairment's onset prior to age 22. J.A. 120.

At step four, with respect to Cox's residual functional capacity, the ALJ found that Cox's claims about the "intensity, persistence, and limiting effects" of her depression, anxiety, learning difficulties, and cognitive difficulties were not supported by the record evidence. J.A. 121. He then found that she was capable of "performing simple, routine, and repetitive tasks in [a] low stress work environment[.]" J.A. 124.

As part of these findings, the ALJ considered, among other evidence, the testimony of Dr. Colleen N. Hawthorne, Cox's treating physician. Dr. Hawthorne had advised that Cox has a "good ability to follow work rules, function independently, understand, remember and carry out simple job instructions, demonstrate reliability, and maintain personal appearance." J.A. 123. Dr. Hawthorne then added that, apropos of potential work-related activities, Cox has "highly impaired/limited" reading and writing skills and that her cognitive impairments included "poor attention, concentration, and focus." J.A. 416. She further observed that Cox's "[f]requent low mood and anxiety results in acute heightened cognitive impairment and poor functioning." J.A. 416. And she noted that Cox had "only a fair ability to deal with the public, use judgment, interact with

supervisors, relate predictably in social situations, deal with work stresses, maintain attention and concentration, behave in an emotionally stable manner, and understand, remember, and carry out complex and detailed job instructions." J.A. 123. Finally, Dr. Hawthorne estimated that Cox would be absent from any potential workplace about twice a month because of her health issues.

The ALJ gave only "partial weight" to Dr. Hawthorne's opinion, reasoning that her views were "mostly consistent with the medical evidence," but were "not entirely consistent with Dr. Hawthorne's own mental status findings[,]" her quantitative assessment of Cox's functioning, or other doctors' medical examinations. J.A. 123.

Given these residual functional capacity findings, the ALJ determined at step four of the Administration's process that Cox could perform her past relevant work as a commercial cleaner. The ALJ added that, at step five, there were other jobs in the national economy that Cox would be able to perform, based on a vocational expert's testimony. Because the ALJ found that Cox was not disabled at steps four and five, she was not eligible for SSI benefits.

In August 2018, the Administration's Appeals Council denied Cox's request for reconsideration of the ALJ's decision.

**2**

Cox filed suit in the United States District Court for the District of Columbia seeking to overturn the agency's decision. The parties subsequently filed cross-motions, with Cox seeking reversal and the Commissioner seeking affirmance of the Administration's decision.

11

The Magistrate Judge issued a report and recommendation recommending that the district court grant in part and deny in part Cox's motion for reversal, and deny the Commissioner's motion for affirmance. *Cox v. Saul*, No. 18 Civ. 02389, 2020 WL 9439356 (D.D.C. Sept. 1, 2020) ("*Cox I*"), *report and recommendation adopted sub nom. Cox v. Kijakazi*, No. 18 Civ. 02389, 2022 WL 178953 (D.D.C. Jan. 19, 2022). The Magistrate Judge recommended that Cox's case be remanded to the agency both because the ALJ impermissibly applied the 2017 Listings retroactively to Cox's claim, and because the ALJ should have applied a rebuttable presumption that Cox's intellectual disorder began before the age of 22. *Id.* at *6. The Magistrate Judge found no basis for reversal in the rest of Cox's claims.

**3**

In January 2022, the district court issued an opinion adopting the Magistrate Judge's report and recommendation. *Cox v. Kijakazi*, No. 18 Civ. 02389, 2022 WL 178953, at *1 (D.D.C. Jan. 19, 2022) ("*Cox II*").

The district court held that application of the 2017 Listings to Cox's claim was impermissibly retroactive because it "required Cox to meet more stringent standards" to demonstrate disability, and so "change[d] the legal landscape" for Cox's claim. *Cox II*, 2022 WL 178953, at *7 (alteration in original) (quoting *National Mining Ass'n v. Department of Labor*, 292 F.3d 849, 864 (D.C. Cir. 2002) (per curiam)). The court reasoned that, "[b]ecause the revised rules indeed 'impair[ed] rights [that Cox] possessed at the time she acted,' they were impermissibly applied to her claims." *Id.* at *8 (second and third alterations in original) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)). The district court ruled that remand was appropriate for the agency to determine

if Cox was eligible for benefits under the 2014 Listings. *Id.* at *9.

The district court then rejected Cox's argument that the ALJ failed to apply the treating physician rule to Dr. Hawthorne's testimony. *Cox II*, 2022 WL 178953, at *11. The court concluded that, "[b]ecause the ALJ found Dr. Hawthorne's opinion to be internally inconsistent and in conflict with other evidence in the record, he was not required to give that opinion controlling weight." *Id.* The district court also held that the ALJ had adequately justified that conclusion "by specifying the internal consistency issues * * * and citing the contradictory evidence in the record." *Id.*; *see id.* at *12.

The district court further ruled that any error made by the ALJ at step four—namely, finding that Cox was able to perform her past relevant work—was harmless given his alternative findings at step five. *Cox II*, 2022 WL 178953, at *12. The district court did order, though, that on remand, the ALJ should consider Cox's processing speed in determining her residual functional capacity. *Id.* Finally, the district court declined to consider Cox's claims that the Administration violated the Administrative Procedure Act in promulgating the 2017 Listings. *Id.* at *10; *see also Cox I*, 2020 WL 9439356, at *13 n.20. Accordingly, the district court granted in part and denied in part Cox's motion for reversal, denied the Commissioner's motion for affirmance, vacated the Administration's decision, and remanded to the agency. *Cox II*, 2022 WL 178953, at *12.

**4**

The parties cross-appealed. While the case was being briefed, Cox moved to supplement the record to add certifications about her school records that, in her view,

bolstered her claim of her intellectual disorder's early onset. *See* Order at 1–2, *Cox v. Kijakazi*, No. 22-5050 (D.C. Cir. Oct. 4, 2022).

**II**

The district court had jurisdiction over this case under 42 U.S.C. § 405(g).  We have jurisdiction under 28 U.S.C. § 1291.

The Commissioner's "ultimate determination" about entitlement to benefits "will not be disturbed if it is based on substantial evidence in the record and correctly applies the relevant legal standards." *Butler*, 353 F.3d at 999.  We review the district court's decision and any questions of law, including retroactivity, *de novo*.  *See Jones*, 647 F.3d at 355; *Judicial Watch, Inc. v. Bureau of Land Mgmt.*, 610 F.3d 747, 749 (D.C. Cir. 2010).

**III**

Because application of the 2017 Listings to Cox's pending claim was not retroactive as a matter of law, we reverse the district court's judgment in relevant part, but we remand for further consideration of Dr. Hawthorne's testimony under the treating physician rule.  We otherwise decline to consider Cox's challenges to the agency's decision.

**A**

Our starting point is a presumption against retroactivity by which we "read laws as prospective in application unless Congress has unambiguously instructed" otherwise.  *Vartelas v. Holder*, 566 U.S. 257, 266 (2012); *see also Landgraf*, 511 U.S. at 265 ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law

is and to conform their conduct accordingly[.]"). Similarly, an agency may not promulgate "retroactive" rules without express authorization from Congress. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

At the same time, the general rule is that new law is applied to *pending* cases unless its application "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280; *id.* at 273; *see also National Mining Ass'n v. Department of the Interior*, 177 F.3d 1, 8 (D.C. Cir. 1999) ("An administrative rule is retroactive if it 'takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past.'") (quoting *Association of Accredited Cosmetology Schs. v. Alexander*, 979 F.2d 859, 864 (D.C. Cir. 1992)).

In this case, the parties agree that Congress has not granted the Administration power to promulgate rules that are retroactive within the meaning of *Landgraf*. Cox Opening Br. 29; Commissioner Opening Br. 20. So the question is whether the Administration's application of the 2017 Listings to Cox's pending case was retroactive under *Landgraf*'s standards. It was not.

*First*, application of the 2017 Listings does not impair Cox's vested rights—that is, legal rights that she already possessed when she filed her claim. *See Landgraf*, 511 U.S. at 280; *Association of Accredited Cosmetology Schs.*, 979 F.2d at 864. Cox identifies no pre-filing right she possessed that has been impaired. And Cox's filing of her application for SSI benefits itself did not vest her with any legal right to have her claim decided under the 2014 Listings, as opposed to the 2017

Listings. *See Chadmoore Commc'ns, Inc. v. FCC*, 113 F.3d 235, 241 (D.C. Cir. 1997) (no rights vested on filing for application for extension for implementing license); *Hispanic Info. & Telecomms. Network, Inc. v. FCC*, 865 F.2d 1289, 1294–1295 (D.C. Cir. 1989) ("The filing of an application creates no vested right to a hearing; if the substantive standards change so that the applicant is no longer qualified, the application may be dismissed.").

Cox also does not point to any source of law vesting her with the right to have her disability assessed under one set of regulations rather than another. Nor are we aware of any. The Social Security Act does not provide claimants with the right to have their claims adjudicated under any particular Listings or similar regulatory interpretation upon application. Rather, the statute and implementing regulations simply instruct the Administration to award benefits only to claimants it finds to be disabled. *See* 42 U.S.C. § 1381a; *cf. Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 589 (D.C. Cir. 2001) ("Celtronix never explains where this vested right came from. * * * [I]t is undisputed that the Commission always retained the power to alter the term of existing licenses by rulemaking.").

What we do know is that the Social Security Act gave the Administration "the flexibility and boldness in adjustment to everchanging conditions which it demands[,]" including by statutorily delegating to it the right to make necessary changes to its programs. *See Flemming v. Nestor*, 363 U.S. 603, 610–611 (1960). That flexibility would be significantly hamstrung if the process for evaluating disabilities were locked in the moment a claim was filed, no matter how long it took to adjudicate. And those who would benefit from medical updates to the regulatory regime would be harmed if the agency were required to apply outdated modes of analysis simply because of the date a claim was submitted.

Cox likewise had no right to SSI benefits at the time she filed her claim as her status had not yet been adjudicated. *See McCavitt v. Kijakazi*, 6 F.4th 692, 694 (7th Cir. 2021) (finding application of new Listings to pending claims not impermissibly retroactive in part because "[r]ights under a statute may be said to vest on the date of a judicial decision").

No doubt Cox believed that the 2014 Listings would be applied when she filed her claim. But anticipation alone does not create a vested right. A law that "merely 'upsets expectations based in prior law'" is not retroactive on that basis. *Empresa Cubana Exportadora de Alimentos y Productos Varios v. Department of Treasury*, 638 F.3d 794, 799 (D.C. Cir. 2011) (quoting *Landgraf*, 511 U.S. at 269).

What Cox also overlooks is that her inability to rely on the 2014 Listings is not dispositive of her claim for SSI benefits. The Listings only "operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). An applicant can still demonstrate disability at steps four and five if she shows that she cannot perform her past relevant work, and the Commissioner cannot demonstrate that she can perform other work. So the 2017 Listings "did not deprive her of her ability to prove entitlement to those benefits[.]" *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 656 (6th Cir. 2006) (en banc) (Gilman, J., concurring).

Keep in mind too that the Administration revises Listings to "reflect advances in medical knowledge, treatment, and methods of evaluating" impairments. *See, e.g.*, Revised Medical Criteria for Determination of Disability, Musculoskeletal System and Related Criteria, 66 Fed. Reg. 58,010, 58,010 (Nov. 19, 2001); *see also* Commissioner

Opening Br. 22–23. While Cox argues that the 2017 Listings put her at a disadvantage relative to the 2014 Listings, that is not a universal result. The new Listings may improve other claimants' prospects of obtaining benefits. *Cf., e.g.*, *Brown v. Barnhart*, 370 F. Supp. 2d 286, 291 (D.D.C. 2005) (reversing on grounds of ALJ's failure to apply updated listings, which "deprived Mr. Brown of the opportunity to prove that his condition 'meets or equals a listed impairment'" at step three) (quoting 20 C.F.R. § 404.1520). "Applying the current law, in other words, leads to consequences that are far from universally negative." *Combs*, 459 F.3d at 657 (Gilman, J., concurring).

*Second*, application of the 2017 Listings does not impose a new obligation or duty on Cox. *Cf., e.g.*, *Quantum Ent. Ltd. v. Department of the Interior*, 714 F.3d 1338, 1345 (D.C. Cir. 2013) (new contractual obligation created by law would be impermissibly retroactive). Cox does not claim otherwise. Nor could she. The new Listings do not affect Cox's primary conduct or legal obligations. Rather, the Listings regulate how the Administration makes its decisions about who is entitled to disability benefits. While the Administration's rules affect its own obligations with respect to adjudicating Cox's claim, they have no such effect on Cox. *See Combs*, 459 F.3d at 647.

*Third*, application of the 2017 Listings did not deny Cox fair notice, disrupt reasonable reliance, or impair settled expectations. *See Landgraf*, 511 U.S. at 270. Cox does not argue that the Listings are impermissibly retroactive in any of these senses. She does not contend, for example, that she engaged in any conduct in reliance on having the prior Listings applied to her claim. *See Combs*, 459 F.3d at 646 (explaining how these factors "weigh against finding a retroactive effect" for Listings applied to pending claims).

Similarly, while Cox may have expected that the Listings in effect at the time that she filed her claim would apply to her, that does not constitute a "settled expectation" for retroactivity purposes. Rather, such expectations are those "on which a party might reasonably place reliance." *See Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 540 (D.C. Cir. 2007). But it would not have been reasonable for Cox to rely on having the 2014 Listings applied to her claim. *Combs*, 459 F.3d at 655 (Gilman, J., concurring) (no "justifiable reliance on then-existing regulations" by seeking benefits under earlier listings). For one, Cox may not be eligible for benefits even under those Listings. And there was no reasonable assumption that the Administration would keep its regulations static, particularly given its Notice of Proposed Rulemaking that was in effect when she filed her claim. *See* Revised Medical Criteria for Evaluating Mental Disorders, 75 Fed. Reg. 51,336 (Aug. 19, 2010) (notice of proposed rulemaking).

In sum, because application of the 2017 Listings did not "impair rights [Cox] possessed when [she] acted," impose any new legal obligation on Cox, deprive her of fair notice, unsettle expectations, or disrupt any reasonable reliance, the Administration did not impermissibly apply the Listings retroactively to Cox's pending case. *See Landgraf*, 511 U.S. at 280; *cf. Republic of Austria v. Altmann*, 541 U.S. 677, 693 (2004) ("[R]etroactive statutes may upset settled expectations by taking away or impairing vested rights acquired under existing laws, or creating a new obligation, imposing a new duty, or attaching a new disability, in respect to transactions or considerations already past[.]") (formatting modified).

Cox counters that, under our decision in *National Mining Association v. Department of Labor*, 292 F.3d 849 (D.C. Cir. 2002) (per curiam), application of the 2017 Listings to her claim is impermissibly retroactive. That is incorrect. *National*

*Mining Association* concerned a challenge to the Secretary of Labor's regulations under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq.* *See* 292 F.3d at 853. That Act set up a program to "allocate to the mine operators an actual, measurable cost of their business" in terms of legal and financial responsibility for miners sickened by black lung disease. *Id.* at 854 (formatting modified) (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 19 (1976)). We noted there that, "where a rule 'changes the law in a way that adversely affects [a party's] prospects for success on the merits of the claim,' it may operate retroactively," and so be impermissible. *Id.* at 860 (quoting *Ibrahim v. District of Columbia*, 208 F.3d 1032, 1036 (D.C. Cir. 2000)).

Cox seizes on that language to argue that the 2017 Listings were retroactively applied because they adversely affected her prospects for success on her benefits claim. Cox overreads *National Mining Association*. That case applied the same test for retroactivity that we do here, *see* 292 F.3d at 859, and so it did not hold that any rule that makes a party's success less likely is impermissibly retroactive. The language Cox leans on—that a change in law might be impermissibly retroactive by "adversely affect[ing] a party's prospects for success"— was just a shorthand explanation for how a procedural rule could affect substantive rights in a way that could be impermissibly retroactive. *Id.* at 860 (formatting modified); *see id.* at 859–860 ("Where a 'procedural' rule changes the legal landscape in a way that affects substantive liability determinations, however, it may operate retroactively. * * * [A rule] may operate retroactively even if designated 'procedural' by the Secretary.").

More to the point, the regulations were impermissibly retroactive in *National Mining Association* because they subjected companies to increased liability for past acts.

Specifically, they directly increased the scope of mine operators' liability and took away existing defenses for conduct they could not control in pending cases. *See National Mining Ass'n*, 292 F.3d at 864 (rule that requires adjudicator to determine whether a miner is totally disabled by black lung disease "without considering his unrelated, nonpulmonary disability" that could contribute to his disability impermissibly retroactive because more miners would be able to recover); *id.* at 865 (rule that created a rebuttable presumption in favor of the miner impermissibly retroactive); *id.* at 866 (rule that codified agency practice of not reducing miner's Black Lung Benefits Act payments by amount received under state workers' compensation laws was impermissibly retroactive). The regulations also added to the pool of miners for whose diseases the operators could be held liable. *Id.* at 867 (regulations "expand[ing] the scope of coverage by making more dependents and survivors eligible for benefits" impermissibly retroactive); *see also Ibrahim*, 208 F.3d at 1036 (finding statute not retroactive where it did not "impose new or additional liabilities, but instead require[d] collection of a fee that was always due") (citation omitted).

Laws with those effects are just what *Landgraf* found impermissibly retroactive. *See* 511 U.S. at 253–254 ("Section 102 significantly expands the monetary relief potentially available to plaintiffs who would have been entitled to backpay under prior law * * * [and] allows monetary relief for some forms of workplace discrimination that would not previously have justified *any* relief under Title VII."). By making an operator's loss more likely for past events, the regulations eroded vested legal rights and defenses.

Those regulations bear no resemblance to the Listings at issue here. The new Listings alter one aspect of a multi-step disability assessment process through which Cox seeks

benefits, as part of the Administration's regular updating of medical criteria to determine disability. *See* Revised Medical Criteria for Determination of Disability, Musculoskeletal System and Related Criteria, 66 Fed. Reg. at 58,010 (Listings revisions "reflect advances in medical knowledge, treatment, and methods of evaluating" impairments). Their application to Cox's claim does not affect her legal obligations or economic liabilities in any way, nor does it impose new consequences for her past conduct. *See Combs*, 459 F.3d at 655 (Gilman, J., concurring) (distinguishing *National Mining Association* by observing that "the change in the administrative regulations did not impose any kind of liability on" the claimant) (citing *Landgraf*, 511 U.S. at 282). Indeed, it may not even affect Cox's ultimate disability determination under the Act: Cox could still prove her disability at steps four and five, because the Listings are just a shortcut to proving disability.

* * *

For all of those reasons, application of the 2017 Listings to Cox's claim was not impermissibly retroactive. We therefore do not consider Cox's objections to the scope of the district court's remedial order.

**IV**

We reverse the district court's holding that the Administration permissibly discounted the evidence from Cox's treating physician, and order the case remanded to the agency for further consideration.

The treating physician rule provides that, in adjudicating Social Security claims, "[a] treating physician's report is 'binding on the fact-finder unless contradicted by substantial evidence[,]'" and so an ALJ cannot "reject[] the opinion of a

treating physician" without a reasonable explanation. *Butler*, 353 F.3d at 1003 (alteration in original) (quoting *Williams*, 997 F.2d at 1498). That is because a treating physician has "great familiarity" with a claimant's medical condition. *Poulin v. Bowen*, 817 F.2d 865, 873 (D.C. Cir. 1987). The Commissioner of the Social Security Administration has formally adopted this doctrine, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829 (2003), recognizing that a treating physician is the most likely "to provide a detailed, longitudinal picture" of a claimant's impairments, and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations[.]" 20 C.F.R. § 416.927(c)(2).

The Administration's regulations accordingly direct ALJs to give special consideration to the medical opinion of a claimant's treating physician. *See* 20 C.F.R. § 404.1527. They explicitly provide that, "[i]f we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and the doctor's evidence is "not inconsistent with the other substantial evidence in your case record, *we will give it controlling weight*." *Id.* § 416.927(c)(2) (emphasis added). Correlatively, an ALJ cannot afford any lesser weight to a treating physician's opinions without satisfactorily explaining why. *See id.* § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.").

The ALJ here failed to adhere to those standards. The ALJ only afforded Dr. Hawthorne's medical judgment "partial weight" when determining Cox's residual functional capacity, yet failed to reasonably explain why he discounted her opinion, or even to acknowledge that she was Cox's treating physician.

*See* J.A. 123. Instead, the ALJ focused only on isolated portions of her testimony, rather than considering it as a whole and comprehensive assessment of Cox's condition.

To begin, the ALJ's analysis of Dr. Hawthorne's alleged internal inconsistencies is flawed. The ALJ claimed that Dr. Hawthorne's "opinion is not entirely consistent with [her] own mental status findings, which documented cooperative behavior, goal-directed thoughts, average intelligence, adequate insight and judgment, and intact memory." J.A. 123. As a result, the ALJ discounted Dr. Hawthorne's findings about Cox's overall inability to function in a potential workplace.

But the ALJ had to consider all of the evidence from Dr. Hawthorne in the record. Dr. Hawthorne also wrote that Cox has "[b]elow average" intelligence, at best "fair" insight that was negatively affected by Cox's cognitive capacity, and "[m]ildly impaired" remote memory. J.A. 380. In addition, in a September 2015 examination, Dr. Hawthorne reported that Cox was "[a]nxious [and] [i]rritable[.]" J.A. 401. At that time, Cox was having difficulty being around other people and felt angry, with a low tolerance for frustration. J.A. 402. The ALJ shortchanged that evidence.

The ALJ also found that Dr. Hawthorne's opinion was unreliable because her assessment of Cox did not match up with *some* of the documented mental status findings. But in deciding whether to credit Dr. Hawthorne as Cox's treating physician, the ALJ cannot pick and choose from Dr. Hawthorne's periodic evaluations. As Cox's treating physician, Dr. Hawthorne would naturally see "apparent longitudinal inconsistencies in [Cox]'s mental health[.]" *See Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019). That Cox's affect varied over time is not a surprise. Nor are the

natural ebbs and flows of Cox's wellbeing over successive months of treatment suggestive that Dr. Hawthorne's opinion can be brushed aside. As other circuits have recognized, "[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence[.]" *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014); *see Estrella*, 925 F.3d at 97 (same).

In short, the ALJ erred in "cherry-pick[ing]" Dr. Hawthorne's mental status findings that supported his decision and using them to discount her overall opinion as Cox's treating physician. *See Estrella*, 925 F.3d at 97 ("When viewed alongside the evidence of the apparently cyclical nature of Estrella's depression, the ALJ's two cherry-picked treatment notes do not provide 'good reasons' for minimalizing [the treating physician's] opinion.").

Next, the ALJ determined that Dr. Hawthorne's opinion was inconsistent with quantitative mental health scores that she gave to Cox during treatment. J.A. 123. That, too, was not enough to justify discounting Dr. Hawthorne's uniquely expert opinion. After all, the ALJ elsewhere considered those same scores and explicitly found them to be consistent with the ALJ's own understanding of Cox's "cognitive and intellectual functioning deficits" and evidence "showing she exhibits occasional tearfulness, and anxious and depressed moods." J.A. 124. The ALJ also acknowledged that Dr. Hawthorne's opinion was "mostly consistent with the medical evidence" showing "cognitive and intellectual functioning deficits" and "depression and anxiety[.]" J.A. 123. The scores cannot be (1) consistent with the ALJ's understanding of certain evidence, (2) drawn from Dr. Hawthorne's qualitative opinions, with which the ALJ agreed, and yet still (3) evidence of Dr. Hawthorne's internal inconsistencies.

Finally, the ALJ's explanation for discrediting Dr. Hawthorne because of inconsistencies with other record evidence fell short. The ALJ noted only that "Dr. Hawthorne's opinion is also not consistent with * * * the mental status examinations of other medical practitioners[.]" J.A. 123. In this single line, though, the ALJ failed to explain how Dr. Hawthorne's opinion conflicts with other practitioners, let alone why the other practitioners should be credited over Dr. Hawthorne.

The treating physician rule requires more. As we have said before, it is straightforward legal error when "the ALJ offer[s] little more than [a] bare statement," and "[t]he ALJ's passing references to the other medical opinions are insufficient to override the substantial weight due [the treating physician's] opinion." *Butler*, 353 F.3d at 1003; *see also, e.g.*, *Jones*, 647 F.3d at 355 ("[T]he ALJ did not, as required by the treating physician rule, explain his reasons for rejecting [the treating physician's] opinion."); *Simms v. Sullivan*, 877 F.2d 1047, 1052 (D.C. Cir. 1989) ("[T]he ALJ, however, offered no reason for crediting the consulting physicians over [the treating physician], who had examined appellant regularly since 1978.").

The Commissioner counters that the ALJ discussed other mental status examiners "throughout the decision." Commissioner Opening Br. 53. But any such "acknowledgment of contrary evidence[,]" let alone in such an implicit way, treats the treating physician's opinion as just another piece of evidence in the mix, rather than affording it the weighty deference it is due. *See Butler*, 353 F.3d at 1003.

For that reason, we reverse and remand with instructions to the district court to remand the matter to the Administration to reconsider Cox's claim while either according controlling

deference to Dr. Hawthorne's opinion or offering a substantively reasonable explanation for not doing so.

## V

Cox separately argues that the Administration violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, in adopting the 2017 Listings by failing to comply with notice-and-comment requirements and making an arbitrary and capricious decision.

Because the district court has not yet addressed Cox's APA claims, we leave them for the district court to address as part of its proceedings on remand. *See Cox II*, 2022 WL 178953, at *9; *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 101 (D.C. Cir. 2021) (leaving for the district court to consider the merits of an APA challenge in the first instance).

In addition, Cox filed a motion to supplement the record on appeal with certifications of her school records. Appellant's Opposed Mot. Add Evid., *Cox v. Kijakazi*, No. 22-5050 (D.C. Cir. June 14, 2022). The Administration opposed the motion. *See* Acting Comm'r's Opp. Appellant's Mot. Add Evid., *Cox*, No. 22-5050 (D.C. Cir. June 24, 2022). We leave that matter, too, to be addressed by the district court in the first instance.

\* \* \* \* \*

Although the 2017 Listings are not retroactive as applied to Cox's still-pending claim, the ALJ failed to properly apply the treating physician rule. We leave for the district court to address on remand Cox's APA challenges and her motion to supplement the record on appeal. For the foregoing reasons,

we reverse the district court's decision and remand for further proceedings consistent with this opinion.

*So ordered.*