People v Delvalle (2025 NY Slip Op 51753(U))

[*1]

People v Delvalle

2025 NY Slip Op 51753(U)

Decided on November 3, 2025

Criminal Court Of The City Of New York, Bronx County

Goodwin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 3, 2025
Criminal Court of the City of New York, Bronx County

The People of the State of New York,

against
J. Delvalle, Defendant.

Docket No. CR-030753-24BX

For the Defendant: 
Daniel Teitell
The Legal Aid Society

For the People:
Bronx ADA Daniel Beloosesky

David L. Goodwin, J.

Defendant J. Delvalle [FN1]
moves, among other things, to dismiss on speedy trial grounds because the People did not timely comply with their discovery obligations. While the People's outreach efforts were wanting, the People nevertheless managed to obtain and disclose almost all that was required within the 90-day speedy trial time limit. Since the volume of material disclosed in this relatively straightforward case compares favorably to the few belatedly disclosed or nondisclosed items—and because, in another lucky stroke for the People, none of those items appears to be central to the case itself—application of the factors in the revised C.P.L. § 245.50(5)(a) yields the conclusion that the People exercised reasonable diligence and good faith overall, albeit just barely. As explained further below, dismissal is DENIED, the People are ORDERED to disclose the audit trail logs within 30 days, Wade/Dunaway and Huntley/Dunaway hearings are ORDERED, and all other relief is either referred to the trial court or DENIED.
I. Background
The Allegations, Arrest, and Charges
Delvalle is charged with, among other things, third-degree assault (P.L. § 120.00(1)) in connection with a September 7, 2024 incident inside of a Bronx deli. Delvalle allegedly argued with the complaining witness, threw a milk jug at him, and then struck him repeatedly with a closed fist. Accusatory Instrument at 1. The complaining witness called 911, but Delvalle had [*2]departed by the time officers arrived. See People's Resp. Aff. ¶ 5.
Delvalle was arrested on December 3, charged via a December 4 complaint, and arraigned on December 5. The People served identification and statement notice at arraignment. The complaint and associated notices all identified Officer Mensah as the arresting officer.
The People's Pre-Readiness Attempts to Secure Discovery
Before declaring ready for trial, the People engaged in two main rounds of discovery outreach. The first was from the end of January, a little shy of two months into the case. The second came a month after that, in early March, shortly before the 90-day § 30.30 speedy trial deadline was to expire. See People's Resp. Aff. ¶¶ 10—23 & Exs. 2—10.
In the first attempt, from January 27 and January 28, the People sought 911 records, activity logs, and impeachment materials, among other information. Consisting primarily of two short emails, this outreach did not specifically mention footage from body cameras, although the second email contained a request for "other documents related to this case, not yet mentioned." People's Resp., Ex. 3.
Although the January efforts were in part unrewarded, the People did not reach out again until March 3 and March 4—acknowledged as "last minute request[s]," People's Resp., Ex. 9—when they sought additional material, such as 911 records, DD5s,[FN2]
and activity logs. They also made a specific request for body camera footage, inclusive of the footage from Detective Biondo of the warrant squad, who apparently was involved in apprehending Delvalle. See People's Resp., Exs. 7—10.
The People's Certificate of Compliance
The March outreach was mostly productive, leading to the People filing their certificate of compliance ("COC") and declaring ready at 11:38 p.m. on March 4.[FN3]
The COC reflected disclosure of twenty-eight categories of material, including the aforementioned 911 records, body camera footage and memo books from four officers,[FN4]
impeachment material from four [*3]officers (one overlapping, three different, and otherwise corresponding to the four listed as potential trial witnesses), and surveillance footage.
However, the People did not disclose any material from Detective Biondo. While the People had located a video file corresponding with Detective Biondo's body camera, see People's Resp. Ex. 10, they were unable to access the video before declaring ready. People's Resp. Aff. ¶ 20. Instead, their COC acknowledged that Detective Biondo's footage, which "may be associated with the arrest," remained outstanding. Defense's Mot., Ex. A at 3. The COC recited the attempts on March 3 and 4 to obtain the footage, which included emails and text-messages to the precinct and a March 4 phone message left with Detective Biondo himself. Id.
On March 7, after the COC was filed, the People received an email from a person within the Bronx District Attorney's Office body-worn camera unit, indicating that the person had reviewed Officer Biondo's video and that it depicted "officers . . . sitting in a van." People's Resp., Ex. 10A. The People assumed that this meant the video was not actually associated with the case because it did not depict Delvalle's arrest. People's Resp. Aff. ¶ 20.
Post-Readiness Objections, Communication and Outreach, and Court Appearances
On March 12, the case was adjourned to April 24 for a discovery conference, as the parties continued to confer.
On April 21, about a month and a half after the COC was filed, the defense emailed the People to flag ten missing items: (1) the names and contact information of witnesses seen speaking to police officers who responded to the scene; (2) the correct activity log for arresting officer Mensah, as the log shared was from the wrong date; (3) surveillance footage referenced in a DD5; (4) a list of testifying officers; (5) Biondo's body camera footage; (6) correspondence among detectives; (7) body camera audit trails;[FN5]
 (8) a facial identification section no-match report,[FN6]
which also was mentioned in a DD5; (9) DD5s corresponding with one case entry; and (10) a DD5 corresponding with another case entry. People's Resp., Ex. 13.
Three days later, on April 24, the People twice wrote Officer Mensah to request the missing facial identification system report, correspondence, DD5s, and activity logs. People's Resp., Ex. 14. As a court appearance the same day, the People were directed to respond to the defense email, and the discovery conference was adjourned to June 18.
The People followed up with Officer Mensah a few days later on April 29. Officer Mensah responded on April 29 and May 2 to clarify that there were no activity log entries for the day of the arrest, and that the entire case file had otherwise been shared with the District Attorney's Office. Id., Exs. 16 & 16A.
The People also followed up with Detective Biondo on April 29 regarding his body camera footage. Id., Ex. 15. Apparently having not received a response, the People did not write again until June 17, one day before the next court appearance, at which point another officer shared the video with the District Attorney's Office. Id., Ex. 17. The no-match report was also obtained that same day. Id., Exs. 18 & 18A.
Both Detective Biondo's footage and the no-match report were shared with the defense either on June 17 or June 18. See Defense's Mot., Ex. B (Supplemental COC) ¶ 6; People's Resp. Aff. ¶¶ 31—33. The People also finally responded to the defense's April objections by email of June 17, listing itemized responses to each objection. See People's Resp., Ex. 19.
At the June 18 court appearance, the defense indicated that the People's response to the objections had been received only the day before. The court directed the parties to prepare a joint letter prior to the next conference date of July 23.
The People filed a supplemental COC on July 22, detailing their June efforts.
Delvalle did not appear on July 23, so a bench warrant was stayed. Delvalle did appear on August 11, but no conference was held because a different attorney was standing in for defense counsel. However, Delvalle failed to appear again for the renewed conference adjournment date, and a bench warrant was again stayed before being ordered on August 21.
Delvalle voluntarily returned on the warrant September 4. The law graduate standing in for defense counsel indicated, mistakenly, that the defense had no objections to the COC, which was then deemed valid.
An omnibus motion schedule was set at that appearance, but the motion now at issue was filed a few days later instead. It is now fully briefed and ripe for decision.
II. The Motion to Dismiss
In the relevant portion of his motion,[FN7]
Delvalle contends that the People's COC was invalid because the People failed to timely disclose the body camera footage for Detective Biondo "and other officers" as well as the facial recognition no-match report, and still have not disclosed the body camera audit trails or the names and adequate contact information for the [*4]civilian witnesses seen speaking to officers at the scene. Defense's Aff. ¶ 14.[FN8]
 Delvalle points out that much of this material was always in the NYPD's possession, and thus constructively in the People's possession, yet the People did not seriously begin outreach until well after the 35-day deadline for initial discovery disclosures had expired, see C.P.L. § 245.10(1)(a)(ii), and also did not make serious efforts to obtain the items flagged in April as missing by the defense until June. See Defense's Aff. ¶¶ 28—32. These shortcomings show that the People did not exercise due diligence and good faith before declaring ready on March 4, 2025. Their COC was thus invalid and, because the § 30.30 clock never stopped, the accusatory instrument should be dismissed. See Defense's Aff. ¶¶ 35—46.
Relevant to the above, Delvalle argues that the People's diligence should be assessed under the framework in effect prior to August 2025, as the People's COC predated the recent amendments to Article 30 and 245 of the Criminal Procedure Law. In the alternative, he argues that the People's COC is invalid even under the current standards. See id. ¶¶ 10—11.
On that point, the People respond that the August 2025 revisions to Articles 30 and 245 should apply across the board to Delvalle's motion, which was pending when those statutory revisions went into effect. See People's Resp. at 13—14. So applied, those revisions should preclude consideration of the merits, because the revised C.P.L. § 245.50(4)(c) requires good-faith efforts to resolve discovery disputes and, in the People's view, Delvalle's discovery objections and attempts at conferral were not made in good faith, but were instead "pro forma efforts . . . for the ultimate purpose of filing a motion to challenge the COC." People's Resp. at 32. The People point to the multiple adjournments for discovery conferences that never took place, which the People attribute in part to the defense's refusal to prepare a joint discovery letter and, with regard to the June conference, the insistence on setting a motion schedule instead. See id. at 33. The People also cite the statement by the law graduate who represented Delvalle during his voluntary return on the warrant that there was no objection to the COC, urging that the resultant validation of the COC should be "maintain[ed]." Id. at 34.
Regarding the merits, the People detail the discovery outreach summarized above, arguing that their efforts both before and after readiness amounted to the diligence required under the current versions of Articles 30 and 245. See People's Resp. at 13—14, 20, 35—42. They stress that they provided over 25 categories of items prior to declaring ready, dwarfing the relatively few omissions. See id. at 35.
On the items cited by Delvalle, the People acknowledge that their outreach for the body camera footage came "close to" the end of the 90-day § 30.30 period, id. at 22, but argue that it followed a generalized request for all documents back in January. They also assert that they were unaware of Detective Biondo's body-camera footage until March, when they reviewed other discovery in the case; until that time, they believed only Officer Mensah had body-camera footage relevant to the arrest. See id. at 23. And, upon receiving Detective Biondo's footage, the People also received footage for two other detectives, whom neither the People nor the defense had realized played a substantial role in the case—and which the People nevertheless disclosed upon receipt. See id. at 23.
As to the remaining items, the People respond that (1) the audit trails are not discoverable [*5]because they do not relate to the subject matter of the case; (2) while the People knew from the discovery materials that there was no facial-recognition match, they did not realize that a specific report documenting that failure to match had been separately prepared; and (3) the individuals seen speaking with the police in the footage are not necessarily witnesses because the police did not arrive until seven minutes after the incident, by which point many witnesses had left and other people had entered the store, so they would not have relevant evidence under C.P.L. § 245.20(1)(c). See id. at 23—30.
Finally, the People contend that Delvalle has not shown prejudice resulting from any of the alleged discovery lapses. Nothing relevant was depicted on Detective Biondo's body camera, the no-match report simply repeated that there had been no match (which Delvalle already knew), the surveillance video diminishes the probative value of statements by witnesses at the scene, and the audit trails would be of minimal use to the defense in a case where officers arrived after the incident. See id. at 43—44.
In reply, and in additional to reiterating his arguments, Delvalle defends the good faith of his discovery outreach, citing a deadlock prior to the June 18 conference date and explaining that the assigned attorney was out of the office for an extended period shortly after that date. See Defense's Reply at 8—9.
On substance, he contends that the People did not exercise reasonable diligence prior to or after certifying this case. Prior to the belated disclosure of Detective Biondo's footage, no footage had been shared of the "crucial time" of Delvalle's arrest. See id. at 3. This core shortcoming is itself sufficient to invalidate the COC. See id. at 4. The no-match report could have been used to cross-examine witnesses who claim to have identified Delvalle. See id. at 5. And many courts have concluded that audit trails are discoverable and can be valuable; the People's reliance on cases going the other direction was a calculated risk that should not excuse them here. See id. at 5—8.
III. Procedural Bar & Legal Standard
As mentioned above, the parties dispute whether the pre-August-2025 or post-August-2025 standards apply in this case. The People also interpose a procedural objection based on the application of the post-August-2025 standards for good-faith conferral, arguing that Delvalle's efforts here fell short.
Beginning with the procedural objection, most of the alleged conferral shortcomings occurred before the August effective date of the revised Article 245. A new procedural rule cannot fairly be deployed in this way against conduct predating its effective date.[FN9]
Cf. People v. Grant, — Misc 3d —, 2025 NY Slip Op. 25217, at *6 (N.Y.C. Crim. Ct., Bronx Co. 2025) (concluding that the conferral requirement could not be retroactively applied to procedurally bar a motion filed before the statute was revised).
Even if it were otherwise, Delvalle cogently explains why he saw no further value in conferral as of June. He had identified flaws in the People's discovery disclosures as of April—a month and a half after the People certified ready—yet had not received a response to his objections for approximately two months. As articulated further in the discussion below, [*6]Delvalle not unreasonably believed that the triggering conditions for dismissal had already occurred. And many of the post-August-2025 issues identified by the People can be attributed to both the assigned defense attorney's being out of the office and Delvalle's own failures to appear, which complicated the defense's ability to anticipate when a discovery conference might be held.
Finally, to the extent the People rely on the erroneous concession by a law graduate at the voluntary-return appearance that the defense had no objections to the COC, the equities favor forgiving that error. It is true that, as a general matter, clients are held accountable for the acts and omissions of their attorneys, especially when they have chosen those attorneys. See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 396—97 (1993). That rule, however, is generally applied in civil litigation, not criminal proceedings, and has its limits even in civil litigation. See New Penn Fin., LLC v. Rubin, 207 AD3d 730, 732 (2d Dept. 2022); see also Mullin v. Balicki, 875 F.3d 140, 154—55 (3d Cir. 2017) (concluding that a substantial clerical error in civil litigation could be excused under the relevant federal standard). In criminal cases, by contrast, the guarantee of effective assistance of counsel means that a defendant can be more easily relieved from the consequences of mistakes in representation. See United States v. Munoz, 605 F.3d 359, 369 (6th Cir. 2010) (recognizing this distinction); cf. Parrilla-Lopez v. United States, 841 F.2d 16, 20 (1st Cir. 1988) (distinguishing strategic errors from mistakes); see also State v. Wayne J., 149 AD3d 846, 847—48 (2d Dept. 2017) (explaining that claims of ineffective assistance of counsel function as an exception to the rule that a client is bound by an attorney's acts or omissions).
Here, the error was an inadvertent, nonstrategic mistake made by a law graduate who was standing up on the case for the return-on-warrant appearance only. The resulting validation of the COC was not a finding on the merits, but instead was made in absence of opposition, in the context of a statutory scheme with a flexible approach to finality. See, e.g., C.P.L. § 245.50(4)(c)(ii) (permitting otherwise-untimely COC challenges based on changed circumstances). In any event, there is wisdom in the liberal application of grace in a busy misdemeanor court, where many practitioners are newly admitted or, as here, not admitted at all—and where the realities of the calendar mean that counsel who stands is frequently not the assigned attorney on any given case.
Thus, while the precise contours of "good faith" negotiation under the revised statute have yet to be defined, Delvalle's efforts were well within the norm for pre-August-2025 conferrals in this County. For these reasons, his arguments are not procedurally barred, and will instead be addressed on the merits.
But the parties also dispute the appropriate test for the merits—and, in particular, whether the People's diligence should be assessed under People v. Bay, 41 NY3d 200, 212 (2023), or under the codification/expansion of Bay found in, among other places, the revised C.P.L. § 245.50(5)(a). The new standard explicitly permits the consideration of whether discovery errors were significant or prejudicial, to the extent Bay did not.[FN10]

For substantially the reasons discussed by Judge Bahr in People v. Jefferson M.Q., — Misc 3d —, No. 2025 NY Slip Op. 25224, at *2—3 (N.Y.C. Crim. Ct., Bronx Co. 2025), the appropriate standard for assessing diligence in a pending case is the one found in the revised § 245.50(5)(a). The Legislature directed that the revised Articles 30 and 245 would apply to all cases pending at the time of their August effective date, and use of the new diligence standard is appropriate—unlike the procedural bar discussed above—because application of the revised standard does not have an impermissible retroactive effect in this context. See Cox v. Kijakazi, 77 F.4th 983, 991—92 (D.C. Cir. 2023) (applying retroactivity analysis to revised Social Security listings and concluding that retroactive application was appropriate); U.S. Sec. & Exch. Comm'n v. Ahmed, 72 F.4th 379, 400 (2d Cir. 2023) (applying disgorgement amendments retroactively in light of applies-to-pending-case language). To the extent that changes of standards of proof and persuasion in a way favorable to a state are treated differently—and to the extent that this is such a change—the Legislature's inclusion of pending-case language is sufficient to give the revisions retroactive effect. Contrast with Lindh v. Murphy, 521 U.S. 320, 327—29 (1997) (concluding that certain sweeping changes to federal habeas corpus effectuated by the Antiterrorism and Effective Death Penalty Act of 1996 did not apply retroactively to pending cases when, among other things, Congress did not include pending-case language that applied to the relevant chapter).
Accordingly, the People's diligence is assessed under the revised § 245.50(5)(a). Factors relevant to diligence are fact- and case-specific, and include the People's efforts to comply with their obligations, the volume of discovery provided, the complexity of the case, the People's response to objections from the defense (or, if applicable, whether the People fixed any omissions on their own initiative), and "whether the belated discovery was substantively duplicative, insignificant, or easily remedied" or otherwise prejudiced the defense. Id.
IV. Discussion
On the merits, this case is a close call. As explained below, the People took massive risks in how they approached discovery, and their response to the defense's objections was wanting. At the same time, however, the People got lucky, as they managed to obtain and disclose almost all material discovery by the close of the 90-day § 30.30 deadline. And due to the particular facts of the case, the belated body-camera disclosures, which might otherwise be fatal, appear to have been of limited relevance. Accordingly, the record overall demonstrates sufficient diligence to withstand dismissal, at least as of right now.
To be clear, the People's outreach efforts were altogether unsatisfying. They did not undertake initial discovery obligations until more than 35 days after the case began, despite the command to the contrary in C.P.L. § 245.10(1)(a)(ii). Then, despite the partial lack of success of their initial outreach, the People did not renew their efforts until the 89th and 90th days of the 90-day speedy trial clock. By delaying their initial discovery efforts until after the initial 35-day [*7]deadline and then making no additional efforts until the eleventh hour,[FN11]
the People increased the likelihood of errors and omissions, all while assuming enormous risk that any defect would be fatal to an overall assessment of due diligence, especially under the pre-August-2025 standards then in effect. See People v. Rubio, — Misc 3d —, 2025 WL 2655297, at *4—5 (N.Y.C. Crim. Ct., Bronx Co. 2025) (Sorrentino, J.) (invalidating COC when, among other things, the People made only two discovery requests, the latter on "the date of the filing of the COC itself").
The People's post-readiness efforts fare the same. Despite knowing about Detective Biondo's body camera and mentioning its unavailability in the COC, the People made no additional effort to obtain it prior to receiving Delvalle's objections, apparently based on the mistaken belief that (per the March 7 email) it showed nothing of importance. See People's Resp. Aff. ¶ 20. But even if that had been so, body cameras connected with the arrest could conceivably relate to the subject matter of the case. Since the People had already mentioned the footage in the COC, assuming its irrelevance was dangerous, especially without having seen it firsthand. Even then, after receiving Delvalle's objections, the People undertook no additional efforts between April 29 and mid-June, a delay of almost a month and a half, although they were able to swiftly obtain the video (and the videos from the other officers) once they tried to do so in June.
Much the same record applies to the no-match report, audit trail logs, and witness information. There is no clear reason why it took until June to respond to the defense's objections.
Thus, many of the relevant § 245.50(5)(a) factors—knowledge of missing material, explanation of lapses, self-correction, timely response to the defense's objection—weigh against the People. And while the People did correct most of the errors, they did so far later than they should have. Were the errors more systematic or fundamental to the defense's ability to prepare a case, they would counsel in favor of dismissal.
But the People also were lucky, because the eleventh-hour attempts to achieve discovery compliance proved fruitful. Narrowly within the 90-day deadline, the People were able to provide ample discovery, including surveillance footage, 911 records, activity logs, body-camera footage from the response to the incident, and so on. The volume of material provided easily exceeded the volume of discovery outstanding. It is telling, in fact, that the defense's objections were comparatively circumscribed, and that Delvalle did not renew many of them in his motion, because several (such as those pertaining to possibly missing DD5s, or to Mensah's activity log) turned out to be unfounded.
Compared with what was provided, the missing material was not particularly important. While Delvalle is correct that missing body camera footage can often lead to dismissal, Defense's Reply at 3, the record does not reflect why this belated disclosure should yield that outcome. First, while Delvalle contends that he was missing footage of the arrest, the COC reflects disclosure of footage from Officer Mensah, who is listed throughout as the arresting officer and who (1) heard and recorded Delvalle's inculpatory statement and (2) conducted the [*8]identification procedure. And while being deprived of additional footage of the arrest could, as Delvalle argues, affect the defense's ability to "see what actually happened and to assess suppression issues regarding any statements the defendant made and any items seized, and to cross-examine police witnesses regarding their observations at the time," Defense's Reply at 3—4, the People appear to have been lucky here, too; Delvalle does not connect his suppression request to any of the belatedly disclosed items, or identify any "statements and observations" beyond those already addressed. Defense's Aff. ¶ 53.
The same holds with regard to the no-match report. Delvalle was aware that a no-match report was generated, meaning that he knew there had been no match. While it would have been better to have the actual report in hand, the report itself does not appear to have changed that assessment in any way. With or without the report, and with the knowledge that there had been no match, he would likely still have been able to "cross-examin[e] witnesses who claim to have identified the defendant" in the same way. Defense's Reply at 5.
The undisclosed material does not significantly change the balancing of the factors, as least as of right now. Regarding the discoverability of audit trails, the People cite favorable trial court decisions, while Delvalle relies on his own, characterizing the People's authority as "comparatively old and based on factually incorrect information about the creation, maintenance, and purpose of audit logs, and a misreading of the plain language of the statute," yet also conceding that "there is not yet any appellate authority" on the issue, Defense's Reply at 6, 8. As resolving this issue would not be case-dipositive, and because little would be gained by throwing another pebble into the deep well of nonbinding authority, the People are instead ORDERED, pursuant to C.P.L. § 245.35(4), to provide the logs to Delvalle within 30 days of this order.
Finally, regarding the contact information, the People's position appears to be that (1) the individuals who are seen assisting the complainant are store employees whom the defense could have contacted via the store's phone number, which the People provided, and (2) many of the other individuals arrived after the incident and are thus not witnesses. These factual representations were made in the response memorandum of law, not the sworn affirmation, undermining them as competent evidence. See Bisk v. Manhattan Club Timeshare Ass'n, Inc., 118 AD3d 585, 585 (1st Dept. 2014); Kulhawik v. Holder, 571 F.3d 296, 298 (2d Cir. 2009). It is otherwise difficult to evaluate who these people were or are, or whether the audio heard on the body camera footage definitively establishes, one way or another, whether they witnessed the incident or its aftermath.
In sum, the items that were belatedly disclosed were those of little apparent consequence to the case, and were overwhelmed by the otherwise comprehensive discovery proffer. The nondisclosed materials do not change things as of right now. As a result, the § 245.50(5)(a) factors weigh narrowly in favor of the People—all that is required to conclude that the COC was supported by due diligence. Because there is no argument that dismissal would be warranted if the clock did not stop when the COC was filed on the 89th or 90th day, the branch of the motion seeking dismissal is DENIED.
* * *
For the reasons set forth above, the motion to dismiss is DENIED. The People are ORDERED to disclose the audit trail logs within 30 days of this decision. Regarding the omnibus requests, Huntley/Dunaway and Wade/Dunaway hearings are ORDERED. All Sandoval/Molineux/Ventimiglia/preclusion issues are referred to the trial court. Any other request for relief not specifically mentioned is denied.
Dated: November 3, 2025
Bronx, NY
David L. Goodwin
Judge of the Criminal Court

Footnotes

Footnote 1:The version of this opinion submitted for electronic publication has been lightly redacted to remove identifying information.

Footnote 2:A DD5 is a complaint follow-up informational report. See Gould v. N.Y.C. Police Dep't, 89 NY2d 267, 272—73 (1996); Dufort v. City of New York, 874 F.3d 338, 344 (2d Cir. 2017).

Footnote 3:This was either the 89th day (by the People's reckoning, which measures from the date of arraignment) or the 90th (by Delvalle's, which measures from the date listed on the complaint). In a case like this one, the § 30.30 clock starts running on the date the accusatory instrument was filed. See C.P.L. § 1.20(17). Even assuming that the complaint was filed on the day it was dated, however, the People's after-hours declaration on the 90th day would have sufficed to stop the clock in time, as "[e]lectronic submission of a statement of readiness on or before the due date, regardless of time of day, satisfies the [§] 30.30 deadline." People v. Licius, — NY3d —, 2025 NY Slip Op 05873, at *1 (Oct. 23, 2025).

Footnote 4:The People provide a slightly different list of officers in their response affirmation, substituting Officer Feimer for Officer Mensah in the list of body-worn camera footage and adding Officer Feimer to the list of activity logs. See People's Resp. Aff. ¶¶ 21—22. Officer Feimer's name is indeed referenced in People's Exhibit 11 for activity logs and body-worn camera footage, but is not otherwise mentioned in the People's COC, and his role is not specified. The defense does not highlight the inconsistency, however, so it will not be explored further.

Footnote 5:Audit trails are metadata about the body camera footage, including "who has viewed the video in question and when; when the camera was turned on and off; how charged the device's battery was at the time; when the device was connected to a charger," and so on. People v. Rodriguez, 84 Misc 3d 685, 686 (Sup. Ct., Kings Co. 2024); cf. Wright v. Stephens, 239 AD3d 1271, 1274 (4th Dept. 2025) (discussing equivalent documents in the context of electronic medical records).

Footnote 6:The NYPD's facial identification section uses facial recognition software and human intervention to match scene images to arrest photos. See NYPD Questions and Answers: Facial Recognition, https://www.nyc.gov/site/nypd/about/about-nypd/equipment-tech/facial-recognition.page (last visited Nov. 2, 2025); People v. Reyes, 69 Misc 3d 963, 964 (Sup. Ct., NY Co. 2020) (Dwyer, J.).

Footnote 7:The twenty-page argumentative appendix, which purports to raise "key points" about the validity of COCs, will not be considered. Neither the People nor a court must hunt through an argumentative appendix to find and respond to arguments or positions that may or may not be relevant to the actual case. Moreover, the scales here tip heavily in favor of "may not," as much of the appendix pertains to impeachment material, a subject that is not relevant to Delvalle's actual motion.

Footnote 8:Delvalle does not mention the other material addressed in his April 24 objections, so the discussion that follows assumes those problems were remediated.

Footnote 9:The People rely entirely on the new statutory obligation under the revised Article 245, not on any independent obligation that may have arisen from a court order. Accordingly, this discussion is confined to the retroactive application of the Article 245 obligations.

Footnote 10:Bay held that the defense was not required to show prejudice in order to obtain the remedy of dismissal, reasoning that the People's discovery obligations were now tethered to § 30.30, dismissals under which never required a showing of prejudice. See Bay, 41 NY3d at 213—14. While many lower courts, including this one, sometimes interpreted this to mean that prejudice was of little or no relevance to the People's diligence, Bay can plausibly be read to limit the discussion of prejudice to remedies, not the assessment of diligence. This opinion assumes, without deciding, that the standard did indeed change.

Footnote 11:Indeed, had Licius gone the other way, the People's statement of readiness could have been invalid at the time it was filed—and Licius had been pending at the Court of Appeals since April 2024, well before this case commenced. See People v. Licius, 41 NY3d 984 (2024) (reflecting April 2024 leave grant).